## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**DEEPALI TUKAYE**                        PLAINTIFF

*4:23cv420-LPR*

**VS.**

**MATT TROUPE, (A/K/A MATT TROUP) , INDIVIDUALLY,
AND IN HIS OFFICIAL CAPACITY AS CEO OF CONWAY
REGIONAL MEDICAL CENTER, THE CITY OF CONWAY,
HEALTH FACILITIES BOARD (OF CONWAY REGIONAL
MEDICAL CENTER), AND JOHN DOE 1**                        **DEFENDANTS**

*FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
MAY 04 2023
TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK*

## COMPLAINT

Comes the Plaintiff, **DEEPALI TUKAYE,** by and through counsel, **SUTTER &
GILLHAM, P.L.L.C.;** and, for this Complaint, she states:

### PARTIES AND JURISIDCTION

1.    Plaintiff, **DEEPALI TUKAYE**, is a resident and citizen of Texas, who sues
**MATT TROUPE, (A/K/A MATT TROUP, HEREINAFTER "TROUPE"),** an Arkansas
resident and citizen, **CONWAY REGIONAL MEDICAL CENTER**, a corporation domiciled in
Arkansas who operates a public hospital in Conway, Arkansas under the direction and control of
**THE CITY OF CONWAY, HEALTH FACILITIES BOARD (OF CONWAY REGIONAL
MEDICAL CENTER)**. *See Exhibit A.*  Plaintiff also sues John Doe 1, believed to be Conway
Regional Medical Center's insurance carrier, who is sued in the event Conway Regional is deemed
to be a private non-profit. This is an action for tortious interference with contract/business
expectancy, as well as discrimination under 42 USC 1981 and 42 USC 1983. This Court has
Federal question and diversity subject matter jurisdiction over Plaintiff's claims. Accordingly, this
Court has personal jurisdiction over the parties.  Since the acts given rise to this action arose in
Faulkner County, Arkansas, venue is proper under 28 USC 1391(b).

This case assigned to District Judge *Rudofsky*
and to Magistrate Judge *Kearney*

## GENERAL ALLEGATIONS OF FACTS

2.      Plaintiff hails from India and is a medical doctor.

3.      At all times relevant, Plaintiff performed her job with Jack Stephens Heart Institute satisfactorily.

4.      Plaintiff had a contract with Jack Stephens Heart Institute, a copy of which is attached hereto as *Exhibit B*.

5.      During the course of the contract, Plaintiff was stationed at Conway Regional Medical Center.

6.      Matt Troupe is the CEO of Conway Regional Medical Center, which is a public hospital operated by the City of Conway, as described in *Exhibit A.*

7.      During her tenure as a credentialed physician at Conway Regional Medical Center, Plaintiff raised concerns about the quality of health care being provided at Conway Regional Medical Center by a fellow physician, who is Caucasian.

8.      Rather than investigating Plaintiff's concerns, Defendants, acting under color of law, opened an investigation into Plaintiff, but did not give Plaintiff notice of the investigation in compliance with the Arkansas Peer Review Fairness Act.

## COUNT I

9.      Plaintiff re-alleges the foregoing as if fully set out herein.

10.     In retaliation for Plaintiff's report of her good faith concerns about health care at the Conway Regional Hospital, and for no good, legal reason, Matt Troupe, acting as a special employee for the Conway Regional Medical Center and City of Conway, threatened to terminate Jack Stephens' contract with Conway Regional Medical Center, which provides cardiology services, if Jack Stephens did not relocate Plaintiff to another hospital.

11. Plaintiff had done nothing wrong, but Jack Stephens advised Plaintiff it would not be able to place her at another location, thereby effectively terminating the contract.

12. Troupe then renewed contract with Jack Stephens within 72 hours of Plaintiff tendering her notice to leave.

13. The Peer Review Fairness Act imposes a number of duties on hospitals regarding the physician-credentialing process. The duties attach once a "professional review activity" begins.

14. A professional review activity includes "investigations," which are defined as "a process conducted by a professional review body to obtain facts related to a concern or complaint about a physician in order to determine whether a professional review action should be requested or recommended." Ark. Code Ann. § 20-9-1303(4), (7) (Repl. 2014).

15. Any time a "professional review activity" or "investigation" begins, a hospital must give notice to the doctor, include the doctor's attorney in the fact-finding process, provide exculpatory information, and allow the doctor to lobby the peer review body. Ark. Code Ann. § 20-9-1304.

16. Should the hospitals fail to comply with their duties, a doctor could sue for an injunction and attorney's fees. Ark. Code Ann. § 20-9-1307(a), (b). Thus, the hospitals' obligations arise in the ordinary course of business: anytime someone complains about a doctor—and the hospital seeks to find facts—a whole host of obligations arises.

17. However, Mr. Troupe acting on behalf of City of Conway and retaliated against Plaintiff and interfered with her contractor/business expectancy by threatening to cancel the contract with the Jack Stephens Heart Institute, if Plaintiff was allowed to practice medicine at Conway Regional Medical Center.

18.     *Exhibit A* is a valid contractual relationship or a business expectancy.

19.     Defendants had knowledge of the relationship or expectancy on the part of the interfering party.

20.     Defendants illegally and improperly intentionally interfered, induced or caused a breach or termination of *Exhibit A.*

21.     As a result, Plaintiff was damaged because she lost wages, retirement benefits, incurred expenses, lost earning capacity, and incurred other damages in amount to be determined at trial.

22.     Defendants' actions were so egregious so as to warrant the imposition of punitive damages.

## COUNT II

23.     Plaintiff re-alleges the foregoing as if fully set out herein.

24.     Plaintiff had a vested property interest in *Exhibit A* and a vested fundamental right to practice medicine at Conway Regional Medical Center.

25.     Defendants, acting under color of law, deprived Plaintiff of her rights without Due Process.

26.     As a result, Plaintiff was damaged because she lost wages, retirement benefits, incurred expenses, lost earning capacity, and incurred other damages in amount to be determined at trial.

27.     Defendants' actions were so egregious so as to warrant the imposition of punitive damages.

## COUNT III

28.     Plaintiff re-alleges the foregoing as if fully set out herein.

29.     Plaintiff hails from India, and she is a female.

30.     In violation of 42 USC 1983, 42 USC 1981, and the ACRA, Defendants have discriminated against the Plaintiff on the basis of her race.

31.     But for Plaintiff's race, Defendants would not have initiated an investigation into Plaintiff's practice of medicine or threatened to terminate Jack Stephen's contract to provide cardiology services at Conway Regional Medical Center.

32.     As a result, Plaintiff was damaged because she lost wages, retirement benefits, incurred expenses, lost earning capacity, and incurred other damages in amount to be determined at trial.

33.     Defendants' actions were so egregious so as to warrant the imposition of punitive damages.

## JURY DEMAND

34. Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff, **DEEPALI TUKAYE,** prays for appropriate compensatory and punitive damages; for attorneys' fees; for costs; for a trial by jury; and, for all other proper relief.

Respectfully submitted,

By:

Luther Oneal Sutter, Esq., ARBN 95031
Lucien R. Gillham, Esq., ARBN 99199
**SUTTER & GILLHAM, P.L.L.C.**
Attorneys for Plaintiff
1501 N. Pierce, Ste. 105
Little Rock, AR 72207
501/315-1910  Office
501/315-1916  Facsimile
Lucien.gillham@gmail.com
Luther.sutterlaw@gmail.com

Doc#1999- **16999**

R-13577

**ORDINANCE NO. 0-99- 67**

**AN ORDINANCE CREATING THE CITY OF CONWAY, ARKANSAS HEALTH
FACILITIES BOARD (CONWAY REGIONAL MEDICAL CENTER) PURSUANT TO THE
PROVISIONS OF ARKANSAS CODE OF 1987 ANNOTATED, TITLE 14, CHAPTER
137, (A.C.A. 14-137-101, et seq); PRESCRIBING OTHER MATTERS
RELATING THERETO; AND DECLARING AN EMERGENCY.**

WHEREAS, the City of Conway, Arkansas (the **"City")**, pursuant
to the provisions of Arkansas Code of 1987 Annotated, Title 14,
Chapter 137, (the **"Act")**, is authorized to establish public
facilities boards for the purposes set forth in the Act, which
include assisting in the financing of health care facilities within
or near the City; and

WHEREAS, Conway Regional Medical Center, an Arkansas nonprofit
corporation (which name when used herein refers to Conway Regional
Medical Center or any affiliate thereof or successor thereto)
proposes the financing and refinancing of capital improvements to
a general, acute care hospital in the City (the **"Project")**; and

WHEREAS, the Project is plainly in the interest of the City
and its inhabitants; and

WHEREAS, financing arrangements must be made to fund, on the
best possible terms, the Project and to make provision for the
financing and refinancing Subsequent Projects (hereinafter
defined):

NOW THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY
OF CONWAY, ARKANSAS::

**Section 1.   Findings.**   The City Council of the City hereby
finds and determines:

(a)  The Project will make available advances and innovations
for the health care of inhabitants of the City and the State of
Arkansas, and the Project is plainly in the interest of the City
and its inhabitants.   Further, proper planning dictates that
provision should be made for financing any additional facilities
that may be required in the future in order that Conway Regional
Medical Center satisfy the increasing health care needs of the
inhabitants of the City and the State of Arkansas (**"Subsequent
Projects")**.

(b)  Financing of the Project and Subsequent Projects under
the Act, including refinancing of existing debt, is and will be
necessary for accomplishing the Project and Subsequent Projects and
will make available quality health care facilities and services to
the public at lower costs, thereby benefiting the public in general
and the inhabitants of the City in particular.



(c)  The facilities and services afforded by Conway Regional Medical Center are now and hereafter will be made available to patients, staff privileges are afforded to medical and supporting personnel and persons are employed without discrimination on the basis of race, creed, religion or sex.

(d)  The City is authorized by the Act to provide financing of health care facilities through the creation of a public facilities board and the issuance of revenue bonds by such a public facilities board.

(e)  It is in the best interest of the City and its inhabitants that there be created a public facilities board under the Act and that the authority of the board be limited to accomplishing, financing, contracting concerning, and otherwise dealing with health care facilities (as defined in the Act) to be owned or operated by Conway Regional Medical Center, including the refinancing of all or part of existing debt.

**Section 2.  Creating of Board.**  Pursuant to the authority of the Act there is hereby created and established the "City of Conway, Arkansas Health Facilities Board (Conway Regional Medical Center)" (the "Board") with authority as hereinafter provided to accomplish, finance, contract concerning, and otherwise deal with health care facilities (as defined in the Act) to be owned or operated by Conway Regional Medical Center, including the refinancing of all or any part of existing debt.   The initial members of the Board shall be appointed by the Mayor of the City as provided in the Act.

**Section 3.  Powers.**  The Board is empowered, from time to time, to own, acquire, construct, reconstruct, extend, equip, improve, sell, lease, contract concerning or otherwise deal in or dispose of health care facilities, including mortgage loans with respect thereto (including specifically the Project and any Subsequent Project, as hereinbefore defined); provided, however, that the authority of the Board shall be limited to such health care facilities as are sold, leased or mortgaged to Conway Regional Medical Center or are otherwise owned by, dealt in, disposed of, or concerning which a loan is made to Conway Regional Medical Center, pursuant to a contract or contracts between the Board and Conway Regional Medical Center.  The Board shall have all of the powers provided for in the Act, subject to the limitations of this Ordinance, and shall carry out its duties in accordance with the Act.

**Section 4.  Issuance of Bonds.**  The Board is authorized to issue revenue bonds, from time to time, and to use the proceeds, either alone or together with other available funds and revenues, to accomplish the purposes for which the Board is created. Provided, however, that before the issuance of any bonds by the

Board the approval of such issue shall be obtained from the Conway City Council by resolution passed by the Conway City Council.

Such revenue bonds shall be obligations only of the Board and shall not constitute an indebtedness for which the faith and credit of the City or any of its revenues are pledged, and the principal and interest on the bonds shall be payable from and secured by a pledge of revenues derived from the health facilities financed, in whole or in part, from bond proceeds or from any debt previously incurred and refinanced by bonds, and as authorized by and in accordance with the provisions of the Act, together with such other collateral as may properly be pledged.  Each bond issue for a Subsequent Project must be approved by the City Council of the City prior to delivery of such bonds to the purchaser or purchasers thereof.

**Section 5.  Organization; Reports.**  As soon as practicable after the adoption of this Ordinance the Board shall meet and elect officers.  The Board may adopt by-laws and such other rules and regulations, if any, as shall be necessary or desirable for the conduct of its business and consistent with the provisions of the Act.  The Board shall cause to be filed with the City Clerk of the City the annual report described in Arkansas Code of 1987 Annotated §14-137-123.

**Section 6.  Severability.**  If any provision of this Ordinance or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect the other provisions or applications of this Ordinance, which can be given effect without the invalid provision or application, and to this end the provisions of this Ordinance are declared to be severable.

**Section 7.  General Repeal.**  All Ordinances of the City, or parts thereof, in conflict with this Ordinance are hereby repealed to the extent of such conflict.

**Section 8.  Emergency.**  It is hereby found and determined that there is an immediate need for the Project and the financing, therefore in order to meet the needs of the City's inhabitants for health care facilities and services essential for their health and welfare, that the creation of the Board and the exercise of the duties and powers provided in this Ordinance are necessary for the accomplishment of these public purposes and to the preservation of the public peace, health and safety, and that the terms of the financing of the Project are subject to interest rates and economic conditions which cannot be predicted.  Therefore, an emergency is declared to exist and this Ordinance shall be in full force and effect from and after its passage.

PASSED this _22_ day of _June_, 1999.

APPROVED:

_Tab Townsell_
MAYOR  TAB  TOWNSELL

ATTEST:

_Mike Garrett_
MIKE  GARRETT,  CITY  CLERK

## PHYSICIAN EMPLOYMENT AGREEMENT
## FOR CARDIOLOGY SERVICES

THIS PHYSICIAN EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of the 5th day of May, 2017 ("Effective Date") by and between Jack Stephens Heart Institute, LLC, an Arkansas limited liability company ("Employer"), and Deepali Tukaye, M.D., an individual ("Physician").

### RECITALS

A.      Employer, in furtherance of its charitable mission and with the intention of providing a community benefit, operates a cardiovascular clinic for the provision of professional medical services in order to improve the availability of quality clinical services to the residents served by Employer's clinic(s).

B.      St. Vincent Infirmary Medical Center d/b/a St. Vincent Health System ("SVHS"), as the sole corporate member of Employer, and CHI St. Vincent Hospital Hot Springs ("SVHHS"), operates inpatient and outpatient clinics, and provides a variety of services through the SVHS cardiovascular service line, comprised of all SVHS inpatient, outpatient/ambulatory, cardiovascular surgery, diagnostic, rehabilitation and cardiovascular care services (the "Service Line").

C.      Employer may provide certain administrative, business, clinical management or professional services to one or more health care facilities (each a "Hospital") in connection with the operation, medical direction, clinical services, or management of the Hospital's cardiovascular service line pursuant to a written agreement (each a "Services Agreement").

D.      The Service Line includes certain ambulatory clinic facilities which were operated prior to January 1, 2012 by Heart Clinic Arkansas, PA, as physician-owned ambulatory clinical facilities, but which clinical facilities are now operated by SVHS as provider-based clinics and/or as SVHS-owned clinics that are not provider-based, the management of which may be governed by a Services Agreement.

E.      Physician has the knowledge, experience, and desire to provide professional medical services to patients, and to assist Employer in the provision of certain services pursuant this Agreement, and agrees to render such services in accordance with Employer's policies, rules, regulations, and protocols, subject to the terms and conditions of this Agreement and otherwise as provided herein.

In consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the parties, intending to be legally bound, agree as follows:

### AGREEMENT

***Section 1.***      ***Employment.*** Employer employs Physician as, and in the specific capacity of, a medical doctor engaged in the practice of medicine, specializing in Interventional Cardiology ("Specialty"), and to perform such duties associated with Employer's clinical care operations. Physician accepts such employment upon the terms and conditions set forth in this Agreement. Physician's employment under this Agreement shall commence on July 1, 2017, or other date as mutually agreed by the Parties (the "Start Date") and in compliance with the Immigration Act as provided in Exhibit G.



EXHIBIT

***Section 2.***      ***Physician's Duties & Responsibilities.***

2.1      <u>Services; Loyalty</u>.  At the direction of Employer, Physician shall provide the services and perform the duties set forth on the attached <u>Exhibit A</u>, and shall perform such other duties as reasonably assigned by Employer from time to time that are commensurate with the professional medical services normally and customarily performed by a physician specializing in the Specialty. The Cardiovascular Chief Medical Officer ("CMO") will have the power to direct Physician in furtherance of Employer's performance under a Services Agreement, including in connection with the achievement of the Performance Incentive, defined below.  During the Term of this Agreement (as defined in Section 7.1), except with Employer's prior written consent, Physician shall: (i) render professional medical services to patients solely and exclusively on behalf of Employer; (ii) devote his or her best efforts to perform diligently the practice of medicine in the Specialty; and (iii) not accept employment with any other employer or engage in other professional activities for profit, except that the ownership of publicly-traded equity interests of any entity will not be deemed a violation of this provision; <u>provided, however</u>, that Physician may from time to time engage in outside professional activities such as speaking, consulting, teaching, serving as an expert witness, writing books and articles, and similar activities that do not impose upon Physician's full-time obligations to the Employer or require the use of Employer resources; and, <u>provided, further</u>, that Employer approves such outside professional activities in advance, with such approval not to be unreasonably withheld by Employer.  Physician may retain all honoraria and fees for such permitted outside activities, unless otherwise agreed by the parties.

2.2      <u>Abide by Employer's Policies, Etc</u>.  Physician shall be subject to and shall abide by all policies, rules, regulations, and protocols established by Employer that are applicable to Physician.  Nothing in any of Employer's policies, rules, regulations, protocols, or employee handbook, if any, shall be construed to create an employment contract for a specific time or to create any rights in favor of Physician that are contrary to the provisions of this Agreement.

2.3      <u>Maintain Licensure & Certification</u>.  As of the Start Date and throughout the Term of this Agreement, Physician shall (i) maintain a currently valid and unlimited license to practice medicine in Arkansas; (ii) maintain a currently valid and unlimited Drug Enforcement Administration ("DEA") Registration Number and applicable state permit; (iii) meet the applicable eligibility criteria for full participation in the Medicare and Medicaid programs; and (iv) be or remain board eligible or board certified in the Specialty in accordance with the time period(s) established in the medical staff bylaws of Conway Regional Medical Center and/or other Facilities (as defined below), if any.  Physician shall provide Employer with a copy of Physician's Arkansas medical license, DEA Registration, and applicable state permit prior to the Start Date and upon request thereafter.  Physician shall deliver immediately to Employer, upon receipt, a copy of any final decision or pending or threatened administrative or judicial action adverse to Physician's (v) license to practice medicine in Arkansas or any other state, (vi) DEA Registration, (vii) Medicare/Medicaid participation status or provider number(s), or (viii) participation in any federally-funded healthcare program, including without limitation, the Medicare and Medicaid programs.  Physician agrees that Employer may access any data bank or other source of information in order to verify Physician's compliance with these requirements.

2.4      <u>Maintain Third-Party Payor Status</u>.  Physician shall procure, maintain, and be subject to contracting provider status in such health maintenance organizations, preferred provider organizations, and other third party payors, including Medicare and Medicaid, as deemed necessary by Employer; <u>provided, however</u>, that Physician shall not enter into or renew such contracting status unless Employer authorizes such participation in writing.  Physician shall assist Employer in satisfying the requirements of third party payors by, for example, participation in utilization review, peer review, and quality assurance programs.  Physician, at his cost and upon reasonable advance notice to Employer, may review any such third-party payor contracts.

2.5     Maintain Medical Staff Membership.  As of the Start Date Physician shall have, and throughout the Term of this Agreement Physician shall maintain, unrestricted and active medical staff membership with appropriate clinical privileges at Conway Regional Medical Center, Baptist Health Medical Center – Conway, and shall also maintain membership on the medical staff of other hospitals mutually agreed upon by Physician and Employer (collectively, the "Facilities"), provided, however, that Physician may maintain his or her medical staff membership and clinical privileges at other area facilities where Physician, as of the Start Date, is a medical staff member.  Physician may also participate in any accountable care organizations and similar organizations with any facilities at which Physician has privileges, subject to prior written approval of the Employer board of managers.  Physician shall immediately notify Employer of any of the following which occur with regard to the medical staff membership and/or clinical privileges required under this Section or with regard to medical staff membership and/or clinical privileges held at other health care institutions: (i) initiation of an investigation for potential corrective action; (ii) a summary or precautionary suspension; (iii) a recommendation for or final imposition of any adverse professional action; (iv) any focused professional practice evaluation or external review of Physician's care whether imposed as corrective action or as part of the peer review and quality assurance process; (v) medical staff or health care institution evaluation of the Physician's conduct pursuant to the relevant policies on physician behavior or physician health; and (vi) Physician's involvement in a sentinel or adverse event subject to a root cause analysis or equivalent review.  Physician agrees that Employer and SVHS may have access to any information relevant to such actions and Physician agrees to execute any consents and/or releases necessary for access or communication between Employer or SVHS and the relevant health care institution regarding any such actions.

2.6     Exercise Independent Medical Judgment.  Physician shall at all times exercise independent medical judgment and control over all his professional activities and services.  Nothing in this Agreement shall be construed to give Employer any authority over Physician's medical judgment or to direct the means or methods by which Physician practices medicine.

2.7     Maintain Professional Skills.  Physician shall at all times maintain professional competence and skill commensurate with prevailing standards of medical practice in Physician's Specialty, and shall attend and participate in continuing education courses designed to maintain and enhance such skills in accordance with policies adopted by Employer from time to time.  Employer shall reimburse Physician up to Five Thousand Dollars ($5,000) per Contract Year ("CME Amount") which may accrue up to but not to exceed Ten Thousand Dollars ($10,000).  In addition, Employer will allow Physician up to One Thousand Dollars ($1,000) per Contact Year ("Subscription Amount") for professional dues, professional memberships, and professional subscriptions in support of Physician's Specialty; provided, however, that Physician may, in Physician's discretion, ask Employer apply any or all of the Subscription Amount to the CME Amount for CME and CME-related expenses.  Employer allots up to five (5) paid days per Contract Year for Physician to attend CME seminars.

2.8     Medical Records.  Physician shall maintain, in accordance with Employer's policies, to the extent applicable, a standard medical record for each patient treated by Physician pursuant to this Agreement, containing such information and preserved for such time period as may be required by Employer, SVHS, or by law.  Physician agrees to use such electronic medical record system ("EHR") as SVHS determines and makes available for Physician's use, and shall comply with all applicable standards and requirements of the EHR, including, but not limited to, completion of dictation and charts within applicable time periods required by law, regulation, or otherwise established by SVHS and its Affiliates for their Employed Physicians.  The parties agree that the EHR will consist of the Gateway Electronic Medical Management System (GEMMS) EHR, and the treatment of the EHR and medical records shall be in accordance with Employer's current policies and procedures, copies of which have been provided to Physician.  Employer or SVHS shall have custody of and shall be the sole owner of all medical records

concerning all patients treated pursuant to this Agreement.  Upon the expiration or termination of this Agreement, subject to the requirements of applicable law, Physician shall be entitled to obtain copies of the following:

(a)     Records of patients who have requested in writing that Physician assume responsibility for their continuing medical care;

(b)     Records of patients that are necessary or desirable to enable Physician to complete a course of medical treatment for patients that are currently under Physician's care; and

(c)     Records necessary or desirable to enable Physician to defend any malpractice action or other claim against Physician.

For purposes of this Agreement, an "Affiliate" of Employer shall be any entity which controls, is controlled by, or is under common control with Employer, as the case may be.

2.9     Conflicts of Interest. As required under Employer's or SVHS's conflict of interest policies, Physician agrees to promptly report any conflict of interest or potential conflict of interest Physician may have with Employer, SVHS, or any Affiliate, and/or the existence of any influence adversely affecting Physician's decision-making process pertaining to the performance of Physician's duties as set forth herein. Such report shall be made to Employer's Chief Executive Officer, or their respective designees, and Physician shall cooperate as requested by Employer in providing full information concerning such conflict, potential conflict, and/or adverse influence.

2.10     Services Under Services Agreements.  If so required by Employer from time to time, Physician will assist Employer in connection with the performance of management, administrative, professional or other services required to be performed by Employer under the Services Agreement(s), if any, as described on Exhibit B attached hereto.

***Section 3.      Employer's Duties and Responsibilities.*** The duties and responsibilities of Employer are:

3.1     Facilities and Support.   Employer shall furnish Physician with physician office space, administrative assistance, appropriate examination and treatment facilities, supplies, and such additional and auxiliary services as shall be suitable to Physician's position and adequate for the proper performance of Physician's duties and responsibilities under this Agreement.

3.2     Respect Medical Judgment.   Employer shall at all times respect Physician's independent medical judgment and control over Physician's professional medical services.  At no time shall Employer knowingly issue to Physician any direction or impose any requirement that would require Physician to violate the standards for the professional and ethical practice of medicine.

3.3     Compensation and Benefits.  In consideration of Physician's performance of his duties as required by this Agreement, Employer shall pay Physician the compensation set forth in the attached Exhibit C *(Total Compensation)*. Employer will provide the benefits consistent with Employer's benefit policy, as amended from time to time, and is available to Physician upon request. All compensation is subject to all applicable city, state, federal, and other withholding taxes.  Employer reserves the right to change the benefits in accordance with such policies and procedures as are applicable to Employer, when such changes are (i) generally applicable to all physicians employed by Employer, or (ii) when such changes are consistent with benefit changes applied to other similarly situated clinical or executive employees of SVHS or its Affiliates, or (iii) when required by law or regulation.  Physician understands that Physician, Employer, and its Affiliates are each subject to a number of laws and regulations affecting the compensation

and incentives that may be paid under this Agreement. Physician further understands that these laws and regulations and interpretations thereof are subject to change. Physician agrees that notwithstanding anything to the contrary in this Agreement, its exhibits and schedules, or any Employer policy, rule, regulation, or protocol, Employer shall not be obligated to pay and Physician shall not accept any compensation or incentive payment if such payment would violate any applicable law or regulation or result in a financial relationship that does not meet an exception to the Stark Law.

During the first twenty-four (24) months following the Start Date of this Agreement, Physician will be allocated personal time off ("PTO") of six (6) weeks annually. PTO time allotment is to be used for vacation, personal, and sick time, and must be used in accordance with Employer policies. In addition, Physician will receive five (5) paid holidays of clinic schedule annually as defined by Employer. Notwithstanding the foregoing, Physician remains responsible for providing call coverage during company holidays based on the call schedule without additional paid holidays if so scheduled.

3.4     Reporting. Employer shall provide Physician with monthly, year-to-date, and end-of-year financial and accounting reports relating to services performed by Physician pursuant to this Agreement, including, without limitation, gross billings, wRVUs, net collections, accounts receivable by patients and payors, adjustments, and write-offs.

3.5     Certain Expenses. In accordance with Employer's policy, Employer shall pay all medical staff application and reapplication fees for staff privileges at facilities to which Physician renders professional medical services. Employer shall pay all reasonable ordinary and necessary business expenses incurred by Physician on Employer's behalf, but subject to prior written approval of the Employer and consistent with Employer policies.

3.6     Management Services. Employer will direct Physician and other physicians employed by Employer, in connection with the performance of various services in furtherance of Management/ Professional Services related to a Services Agreement.

### Section 4.     Insurance.

4.1     Physician's Eligibility & Coverage Limits.  During the Term of this Agreement, the Employer shall provide Physician, at Employer's expense, with professional liability insurance. Physician shall at all times during the Term of this Agreement be and remain insurable for professional liability (malpractice) coverage, at rates reasonably equivalent to those available with respect to other physician employees of Employer (or otherwise as reasonably determined by Employer), allowing for normal rate differentials among specialties; with such policy limits and subject to such deductibles and retentions as Employer, in its sole discretion, determines to be reasonable and prudent for the protection of Employer and Physician, but not less than as specified in the attached Exhibit E. Notwithstanding the foregoing, in addition to the professional liability coverage limits specified in Section 1.4 of the attached Exhibit E, Employer shall provide, at its sole cost and expense, necessary appropriate excess coverage sufficient to pay any settlements, damages, or judgments against Physician that are in excess of the coverage limits described in Exhibit E, with respect to Physician's professional medical services rendered hereunder, subject, however, to the applicable terms, conditions, and limits of such excess insurance coverage.

4.2     Prior Acts Coverage.  Physician shall, at his or her own cost and expense, provide, purchase or otherwise acquire professional liability "prior acts" insurance coverage to cover all of Physician's professional services rendered prior to Physician's employment with Employer. Physician shall, prior to the Start Date or upon request, provide Employer with a Certificate of Insurance evidencing such coverage.

4.3     Physician's Responsibility for Additional Coverage.  In the event Employer, in its sole discretion, authorizes Physician to engage in professional or other services outside the scope of Physician's employment under this Agreement, Physician shall, at Physician's own cost and expense, purchase or otherwise acquire professional liability insurance coverage in amounts acceptable to Employer to cover all professional services rendered outside the scope of Physician's employment, and shall furnish Employer with a Certificate of Insurance and the declaration page of such policies evidencing such coverage.

4.4     Tail Coverage.  In the event this Agreement is terminated or not renewed, Employer shall purchase or otherwise acquire professional liability ("tail") insurance coverage to cover all of Physician's professional services rendered during the Term of this Agreement.  Physician shall deliver promptly to Employer, upon receipt, a copy of any notice of claim against Physician involving Physician's liability insurance or any adverse action, change or modification to the terms and conditions of Physician's insurance coverage.  Physician shall cooperate in filling out applications or other documents to obtain insurance.

**Section 5.     *Physician's Representations & Warranties.***  Physician represents and warrants to Employer that, as of the Effective Date of this Agreement:

5.1     No Misrepresentations.  All statements made by Physician in any employment application or application for clinical privileges delivered to Employer are true and correct; and

5.2.    Competing Interests.  Physician does not have any financial or other business relationships or ownership interests that involve the provision of health care items or services and that are competitive with or adverse to the business of Employer or any of its Affiliates (as hereinafter defined), except for those previously disclosed to Employer in writing and approved by SVHS; and

5.3     No Violation.  Physician is not subject to or bound by any noncompetition or other restrictive covenant that would be violated or contravened by Physician's execution of this Agreement or that would impede or interfere with the performance of Physician's duties and responsibilities under this Agreement.

**Section 6.     *Billing.***  Employer shall perform all billing of patients and payors and shall pay all costs incident to billing and collections with respect to professional medical services rendered by Physician under this Agreement regardless of where such services are rendered.  All fees or other income from any source attributable to the professional medical services rendered by Physician in the course of Physician's employment by Employer and related activities shall be the sole property of Employer, unless otherwise approved pursuant to Section 2.1 above, and Physician assigns the same to Employer.

**Section 7.     *Term and Termination.***

7.1     Term.  Subject to earlier termination as set forth in this Agreement, the term of this Agreement shall commence on the Start Date and continue through June 30, 2021 (the "Initial Term").  The parties agree to renegotiate an extension of the Initial Term prior to June 30, 2020 with compensation consistent with fair market value.  The inability of the parties to agree in writing, prior to the expiration of the Initial Term, on the terms of compensation for periods subsequent to the Initial Term, shall result in termination of this Agreement upon expiration of the Initial Term.  The Initial Term and any extension term hereunder are collectively referred to as the "Term."

7.2     Immediate Termination by Employer for Cause.  Employer may at its option terminate this Agreement immediately for cause upon the occurrence of any of the following:

(a)     Suspension, curtailment, or revocation of Physician's DEA Registration or Physician's license to practice medicine in any state, including Arkansas, regardless of the pendency of any appeal of such suspension, curtailment, or revocation;

(b)     Termination, limitation, suspension (including summary suspension), or non-renewal by Physician (to avoid sanctions) of Physician's medical staff membership or clinical privileges at any hospital, including termination, for any reason, of Physician's medical staff membership or clinical privileges at SVHS, other than termination, limitation, suspension or non-renewal of Physician's medical staff membership or clinical privileges at a hospital other than SVHS that is without cause or that is not related to quality of care provided by Physician, as reasonably determined by Employer;

(c)     Expulsion, suspension, or other final disciplinary action against Physician by a professional medical organization as a result of professional misconduct, or resignation by Physician from any professional medical organization under threat of disciplinary action for professional misconduct;

(d)     Physician's failure or inability to qualify or continue eligibility for professional liability insurance covering those elements of Physician's employment set forth in this Agreement, including Exhibit A;

(e)     Imposition of any sanctions, including exclusion, suspension, or other limitation, relating to Physician's participation in any federally-funded health care program, including, without limitation, the Medicare and Medicaid programs;

(f)     Physician's death;

(g)     Physician's indictment for or conviction of a crime which relates to the practice of medicine; Physician's conviction of any felony; or Physician's conviction of a misdemeanor involving an act considered a violation of the standards of moral conduct;

(h)     Physician is the subject of an allegation of healthcare fraud, abuse, or similar activities that are criminally or civilly proscribed and which Employer deems to be credible after an internal investigation including in connection with reviews of medical necessity;

(i)     Physician enters into a consent decree or other judicial order or administrative settlement with respect to fraud, abuse or similar activities that are criminally or civilly proscribed;

(j)     Physician jeopardizes the health and/or safety of any patient(s) due to gross inattention or willful neglect of Physician's duties;

(k)     Physician's drug or alcohol abuse or the provision of medical services while under the influence of alcoholic beverages or illegal drugs;

(l)     Breach by Physician of medical ethics, as defined in the "Arkansas Medical Practices Acts and Regulations" by the Arkansas State Medical Board at http://www.armedicalboard.org/index.asp;

(m)     Physician's failure to comply with the Directives or the *CHI Standards of Conduct* (both as defined in the attached Exhibit E);

(n)     Physician becomes "permanently disabled" (as defined in applicable policies and/or benefit plan documents and in accordance with the Americans with Disabilities Act), effective as of the date determined pursuant to the Employer policies and/or benefit plan; or

(o)     Failure by Physician to comply with any other material term and/or condition of this Agreement, and such failure to comply continues for twenty (20) days after Employer gives Physician written notice specifying such failure (or, in the case of a failure that is not reasonably capable of being cured within such twenty (20) days period, if Physician fails to commence a cure within such twenty (20) day period or fails to diligently pursue such cure to completion thereafter), or if the same or similar failure is repeated by Physician at any time during the Term of this Agreement after a twenty (20) day notice has been given by Employer, then Employer may terminate this Agreement by giving Physician written notice of such termination, with the termination effective as of the date such notice is delivered.

7.3     Termination Without Cause.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated without cause as described in Section 1.15 of the attached Exhibit E.

7.4     Termination by Physician.  If Employer defaults in the performance of any of its obligations under this Agreement and such default or breach continues for twenty (20) days after Physician gives written notice specifying such default (or, in the case of a default that is not reasonably capable of being cured within such twenty (20) day period, if Employer or SVHS, as applicable, fails to commence a cure within such twenty (20) day period or fails to diligently pursue such cure to completion thereafter), or if the same or similar default or breach is repeated by Employer or SVHS at any time during the Term of this Agreement after a twenty (20) day notice has been given by Physician, then Physician may terminate this Agreement by giving Employer written notice of termination, with the termination effective as of the date such notice is delivered.

7.5     Other Termination by Physician.  In the event Employer conducts a compensation review for reasonableness pursuant to Section 9 of Exhibit C, and such review results in a reduction of Physician's compensation hereunder, Physician may make an election within ninety (90) days of such reduction to terminate this Agreement, with such termination becoming effective one hundred eighty (180) days after Physician's notice to Employer.

7.6     Omitted.

7.7     Physician's Cooperation Upon Termination.

(a)     In the event of the termination of this Agreement, Physician shall cooperate with Employer to assure the orderly transfer of patients treated by Physician during the course of employment to other physicians employed by Employer. Subject to restrictions, if any, under applicable state law, (i) Physician's cooperation shall include, without limitation, taking all steps necessary or convenient to enable Employer to effect an orderly transfer of charts, records and information pertaining to patients that have been treated by Physician during Physician's Term of employment, and (ii) Physician shall coordinate with Employer in the sending by Employer of a notice to all patients for whom Physician performed services pursuant to this Agreement, signed by Physician, informing them: (y) that Physician is no longer employed by Employer; and (z) the name of the successor physician or physicians who will be available to provide services to such patients.

-8-

(b)     In the event of the termination or expiration of this Agreement for any reason, Physician shall reasonably cooperate with Employer: (i) to complete all administrative tasks necessary for Employer to seek reimbursement for care rendered during Physician's Term of employment; and (ii) in the defense of any claims (including litigation) arising out of the performance by Physician of his duties during the Term of this Agreement and Employer agrees to reimburse Physician for reasonable travel and other related expenses, not to include hourly fees, related to such assistance.

**Section 8.**     *Recordkeeping.* If and to the extent required by 42 U.S.C. § 1395x(v)(1)(I), until the expiration of four (4) years after the termination of the Agreement, Physician shall make available, upon written request by the Secretary of the Department of Health and Human Services (the "Secretary"), or upon request by the Comptroller General of the United States General Accounting Office (the "Comptroller General"), or any of their duly authorized representatives, a copy of this Agreement and such books, documents, and records as are necessary to certify the nature and extent of the costs of the services provided by Physician under the Agreement. Physician further agrees that, in the event he carries out any of his duties under the Agreement through a subcontract with a related organization with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve (12) month period, such subcontract shall contain a provision requiring the related organization to make available until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract upon written request to the Secretary, or upon request to the Comptroller General, or any of their duly authorized representatives, a copy of such subcontract and such books, documents, and records of such organization as are necessary to verify the nature and extent of such costs. The provisions of this Section shall survive the expiration or termination of this Agreement for any reason.

**Section 9.**     *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

**Section 10.**     *Notices.* All notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given upon personal delivery; or twenty-four (24) hours following deposit for overnight delivery with a bonded courier holding itself out to the public as providing such service, or following transmission by email or electronic facsimile, if subsequently mailed as provided herein; or forty-eight (48) hours following deposit in the U.S. Mail, registered or certified mail, postage prepaid, and in any case addressed as follows, or to such other addresses as the parties may designate from time to time:

If to Physician:     Deepali Tukaye, M.D.

 

If to Employer:     Jack Stephens Heart Institute
c/o President
#2 St. Vincent Circle
Little Rock, Arkansas 72205
Facsimile: (501) 552-4271

**Section 11.**     *Waiver.* Failure by either party to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement shall not be deemed a continuing waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of any right or power at any time be deemed a waiver or relinquishment of the same or any other right or power, whether or not similar.

AR0169 Physician Employment Agreement_Interventionalist_JSHI (Tukaye 17) v5 den

**Section 12.**     **Entire Agreement; Amendment.**     All exhibits referenced in this Agreement are incorporated herein by this reference.  This Agreement (including any attached exhibits) contains the entire agreement between the parties concerning the subject matter of this Agreement, and supersedes all other and prior terms, covenants, representations, and agreements, whether oral or written.

**Section 13.**     **General Interpretation; Ambiguities.**     Ambiguities, if any, in this Agreement shall be reasonably construed in accordance with all relevant circumstances including, without limitation, prevailing practices in the industry of the parties in the place where the contract is to be performed and shall not be construed against either party, irrespective of which party may be deemed to have authored the ambiguous provision.

**Section 14.**     **Coordination of Care.**     In order to promote the delivery of quality, coordinated, efficient, cost-effective care for patients of Employer, Physician agrees to utilize services available from the SVHS or its Affiliates except when (i) the use of a different provider is required by the terms of a patient's enrollment or participation in an insurance or other health care plan or as required by law, (ii) Physician determines that the use of SVHS or an Affiliate to provide such services is not in the best medical interests of the patient, (iii) the patient or his or her referring physician on their own initiative requests to use a different provider, (iv) SVHS-affiliated providers do not offer the needed services, or (v) medical emergency requires otherwise.  Physician shall endeavor to regularly communicate with Employer regarding the basis for referrals of patients to a non-SVHS Affiliate provider for such services.

**Section 15.**     **Setoff.**     Upon expiration or termination of this Agreement for any reason, Physician authorizes Employer, at its sole discretion, upon written notice to Physician and to the extent permissible by applicable state and federal laws, to setoff any liability owed to Physician by Employer, including compensation hereunder, against any obligation owed by Physician to Employer or its Affiliates.  Physician agrees to complete any documentation that may be requested by Employer related to such setoff.

**Section 16.**     **Omitted.**

**Section 17.**     **Omitted.**

**Section 18.**     **Further Assurances.**     The parties shall execute and deliver such other documents and perform such further acts as shall be reasonably necessary or convenient to carry out and effectuate all the terms and conditions of this Agreement.

**Section 19.**     **Assignment.**     This Agreement is personal to each of the parties and no rights or duties may be assigned or delegated by either party without the prior written consent of the other; provided, however, that Employer may assign its rights and delegate its duties to any Affiliate or successor in interest of Employer.

**Section 20.**     **Successors.**     This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, administrators, executors, successors and permitted assigns.

**Section 21.**     **Captions.**     The captions contained in this Agreement are not a part of this Agreement, are only for the convenience of the parties and do not in any way modify or amplify any of the terms, covenants, or conditions of this Agreement.

**Section 22.**     **Expenses.**     Unless otherwise expressly provided in this Agreement, each party to this Agreement shall bear sole responsibility for all expenses incurred by such party in connection with this Agreement, including legal fees, whether or not the transactions contemplated by this Agreement are consummated.

**Section 23.**     **Arbitration.**  Any dispute regarding (i) any aspect of this Agreement, (ii) any act which allegedly has or may violate any provision of this Agreement, or (iii) any dispute related to the employment relationship between the parties or the termination of that relationship shall be submitted to binding arbitration in Little Rock, Arkansas before a mutually acceptable arbitrator, as the exclusive remedy for such claim or dispute.   The arbitration shall be in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration (AHLA Arbitration Procedures) to the extent such procedures are not in conflict with this Agreement.  Disputes subject to arbitration include, but are not limited to, all employment-related claims arising under state or federal statutes, common-law torts, and contract claims.  Employment disputes not subject to arbitration include injunctive and equitable relief actions under Section 17 of this Agreement, as well as workers' compensation claims, unemployment compensation claims, and other employment-related claims that parties are not legally permitted to voluntarily arbitrate. The party seeking arbitration shall send written notice to the other party setting forth the nature of the dispute, the dollar amount involved, if any, and the remedies sought. Unless the parties agree otherwise, the arbitrator must be an attorney licensed in Arkansas with experience in employment law, health care law, and contract matters, and will be selected pursuant to the AHLA Arbitration Procedures. For statutory claims, relief, costs and attorney's fees may be awarded as provided by law.  For other claims, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements, in addition to any other relief to which that party may be entitled under applicable laws. Any arbitration award may be enforced under the Federal Arbitration Act or the Arkansas Uniform Arbitration Act, but the parties agree that the sole and exclusive jurisdiction and venue for any such enforcement action shall be the state and federal courts sitting in Little Rock / Pulaski County / Arkansas, and the parties consent to and waive any objection to the jurisdiction of, or the venue of any action instituted in, such courts.

**Section 24.**     **Compliance With Laws.**  Physician and Employer shall each comply with all applicable laws and regulations and performing their respective obligations under this Agreement.  If any provision of this Agreement shall reasonably be determined by either party to violate any applicable law or regulation, then the parties shall promptly and in good faith amend this Agreement (to the extent feasible) as may be necessary or advisable to comply with such law or regulation.  Any such amendment of this Agreement shall, to the extent practical, preserve to each party the economic and other benefits accorded such party in the original Agreement.  If a mutually acceptable amendment cannot be agreed upon, the provisions of Section 1.5 of Exhibit E shall apply.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**EMPLOYER:**                                    **PHYSICIAN:**

**Jack Stephens Heart Institute, LLC**

By:  St. Vincent Infirmary Medical Center,
     its sole member

By: _____          _____
Chad S. Aduddell, President & Chief            Deepali Tukaye, M.D.
Executive Officer

AR0169 Physician Employment Agreement_Interventionalist_JSHI (Tukaye 17) v5 den

## EXHIBIT A
### *Physician's Duties*

1) In connection with Physician's clinical services, Physician shall:

   a) Treat patients according to, and perform such clinical procedures as are consistent with, Physician's licensure, clinical Specialty and privileges, practice and training;

   b) Keep and maintain (or cause to be kept and maintained) appropriate records (including, without limitation, patient charts) on a timely basis relating to all professional medical services rendered by Physician. Timely basis shall constitute a fourteen (14) day period from the time when the professional medical service(s) was rendered. Employer management shall conduct or cause to be conducted chart audits to ensure that Physician is adhering to the terms and conditions regarding appropriate record maintenance. The cost of such audit shall be borne by Employer;

   c) Prepare and maintain all reports, claims, and correspondence necessary or appropriate to the performance of professional services;

   d) Attend professional conventions, post-graduate seminars, and/or continuing medical education programs to maintain and enhance Physician's professional skills, and participate in professional societies on a reasonable basis, at the Employer's expense, and subject to prior approval pursuant to applicable procedures of Employer;

   e) Promote the professional practice of Physician and of Employer at the Employer's expense;

   f) Provide coverage at facilities at which Physician practices when other physician employees of Employer are unavailable due to vacations, holidays, illness, or attendance at professional activities;

   g) Cooperate with Employer and/or SVHS in the event of a claim, threatened claim, or litigation involving Employer and/or SVHS;

   h) Supervise nurses and other personnel in accordance with Employer's policies, procedures, and applicable laws;

   i) Participate in medical staff activities of the Facilities, as applicable, in accordance with the requirements imposed by the Medical Staff Bylaws;

   j) Accept Physician's proportionate share of after-hours call coverage within Employer's practice, unless Physician is excluded by Employer or SVHS policy from such call coverage;

   k) Attend to patients in hospitals and other facilities in which Physician has privileges whenever they are admitted for care in such facilities or secure appropriate coverage for patient care through the St. Vincent Hospitalist program; provided, however, that Employer and SVHS will use their best efforts to ensure that hospitalist physicians who practice at the SVHS collaborate with Physician to confine their inpatient service to an appropriate scope of practice;

   l) Treatment of indigent and charity care patients, including patients covered by Medicaid and other state health programs, provided that Physician shall receive full wRVU credit for all professional services provided hereunder;

m) In furtherance of Employer's stated goal of including physician representation on Employer's Board of Managers and committees of the board, to the extent consistent with the tax-exempt status of SVHS and Employer, participate on the Board of Managers and/or other committees thereof to the extent requested to do so; and

n) Cooperate and participate with Employer in the recruitment of other physicians and medical personnel.

2)     In connection with Physician's performance of Management/Professional Services, Physician shall, consistent with Employer's governance, decision-making, and other processes described in this Agreement and Employer's Operating Agreement, assist Employer in the performance of Management/Professional Services pursuant to a Services Agreement, as such duties may be assigned by Employer to Physician from time to time.

Case 4:23-cv-00420-LPR   Document 1   Filed 05/04/23   Page 24 of 54

**EXHIBIT B**
*Services Agreements*

1.      Employer may enter into one or more agreements for the performance of management, administrative, professional or other services that are performed by Employed Physicians (each, a "Services Agreement").   Physician acknowledges that Physician may not participate in all or any Services Agreements.

2.      Services to be provided and the compensation payable to Employer under each Services Agreement in which Physician may participate and how such compensation will be distributed among the participating physicians under the IDP will be set forth in a separate services exhibit (each, a "Services Exhibit") which shall be sequentially numbered as Exhibit B-1, B-2, etc. and attached to this Exhibit B without further action by Physician. P

3.      The approval of Employer's Board of Managers will be required for (a) any new Services Agreement, (b) the designation of which Employed Physicians may participate in a Services Agreement, (c) any new Service Exhibit, (d) any modifications to Services Agreements or Services Exhibit, and (e) termination of a Services Agreement by Employer. A new Services Exhibit (or any changes to an existing Services Agreement) will become effective on the date approved by Employer's Board of Managers without separate amendment to this Agreement.

4.      A copy of each Services Exhibit for a Services Agreement in which Physician may participate will be provided to Physician within ten (10) days after approval by the Board of Managers. In addition, a copy of any Services Agreement in which Physician may participate will be provided to Physician within ten (10) days upon request by Physician.

5.      In the event of a conflict between the terms of this Agreement or a Services Exhibit, the terms of the Agreement shall control.

6.      Physician's rights and duties under a Services Agreement or Services Exhibit, including participation in and compensation, will always be subject to the terms of the Services Agreement, including without limitation physician participation criteria and termination provisions therein. Physician's participation under a Services Exhibit will terminate upon the earlier of the termination of this Agreement or as provided under the applicable Services Agreement.

B-1

AR0169 Physician Employment Agreement_Interventionalist_JSHI (Tukaye 17) v5 den

Case 4:23-cv-00420-LPR   Document 1   Filed 05/04/23   Page 24 of 54

**EXHIBIT B**
*Services Agreements*

1.      Employer may enter into one or more agreements for the performance of management, administrative, professional or other services that are performed by Employed Physicians (each, a "Services Agreement").   Physician acknowledges that Physician may not participate in all or any Services Agreements.

2.      Services to be provided and the compensation payable to Employer under each Services Agreement in which Physician may participate and how such compensation will be distributed among the participating physicians under the IDP will be set forth in a separate services exhibit (each, a "Services Exhibit") which shall be sequentially numbered as Exhibit B-1, B-2, etc. and attached to this Exhibit B without further action by Physician. P

3.      The approval of Employer's Board of Managers will be required for (a) any new Services Agreement, (b) the designation of which Employed Physicians may participate in a Services Agreement, (c) any new Service Exhibit, (d) any modifications to Services Agreements or Services Exhibit, and (e) termination of a Services Agreement by Employer. A new Services Exhibit (or any changes to an existing Services Agreement) will become effective on the date approved by Employer's Board of Managers without separate amendment to this Agreement.

4.      A copy of each Services Exhibit for a Services Agreement in which Physician may participate will be provided to Physician within ten (10) days after approval by the Board of Managers. In addition, a copy of any Services Agreement in which Physician may participate will be provided to Physician within ten (10) days upon request by Physician.

5.      In the event of a conflict between the terms of this Agreement or a Services Exhibit, the terms of the Agreement shall control.

6.      Physician's rights and duties under a Services Agreement or Services Exhibit, including participation in and compensation, will always be subject to the terms of the Services Agreement, including without limitation physician participation criteria and termination provisions therein. Physician's participation under a Services Exhibit will terminate upon the earlier of the termination of this Agreement or as provided under the applicable Services Agreement.

B-1

AR0169 Physician Employment Agreement_Interventionalist_JSHI (Tukaye 17) v5 den

**EXHIBIT B-1**

*Services Exhibit*
SVHS Cardiology Service Line Services Agreement

This Services Exhibit sets forth compensation, duties, and other provisions applicable to Physician's services under the Services Agreement described below. The Board of Managers of Employer approved the terms of this Services Exhibit on July 1, 2016. This Services Exhibit becomes effective on July 1, 2016. Any capitalized terms not defined herein will have the meaning set forth in Physician's Employment Agreement (the "Employment Agreement") or the Services Agreement, as applicable.

***Physician acknowledges that Physician has limited participation under this Services Agreement. Therefore, payment to Physician for services under this Services Agreement is limited to the hourly rate of $237 as set forth in 6(d) below for actual hours of service provided to Hospital and as appropriately documented in a Time Record. Physician acknowledges and agrees that Incentive Management Fees as described herein are not available to Physician.***

1.    **Services Agreement.**  As used herein, the "Services Agreement" means the Cardiology Service Line Services Agreement between Employer and St. Vincent Infirmary Medical Center d/b/a St. Vincent Health System ("Hospital"), effective January 1, 2012, as amended.

2.    **Term.**  The term of the Services Agreement has been extended and continues through June 30, 2021 and is subject to renewal or early termination as provided therein.

3.    **Participating Physicians.**  All Employed Physicians who satisfy the eligibility requirements described below or set forth in the Services Agreement, other than New Physician Employees and the Employed Physicians providing services to Conway Regional Health System or its affiliate, or as otherwise designated by Employer's Vice President/Administrator and the CMO, are eligible to participate in the provision of services under the Services Agreement.

In order to provide Management Services on behalf of Employer under the Services Agreement, an Employed Physician shall be required to be and remain employed by Employer, a party to and in continuous compliance with Physician's employment agreement with Employer, and agree to comply with the provisions of the Services Agreement and the policies and procedures established by Hospital, Employer and the JOC that are applicable to Employed Physicians in connection with the operation of the Service Line. If at any time an Employed Physician fails to meet the criteria set forth above, such Employed Physician shall be immediately removed from the provision of any Management Services. The Employed Physicians who are eligible to participate under the Services Agreement will be referred to herein as "Participating Physicians."

4.    **Management and Administrative Services.**  Employer, through the Participating Physicians, shall provide management and administrative services to Hospital in connection with the operation, medical direction and management of the Hospital cardiovascular service line, comprised of all Hospital inpatient, outpatient/ambulatory, cardiovascular surgery, diagnostic, rehabilitation and cardiovascular care services (the "Service Line") ("Management Services"). The Management Services to be performed by Employer and which may be engaged in by Participating Physicians, available upon request from Employer. In the event of an amendment to the Services Agreement, this Services Exhibit, including its schedules, will be automatically amended without separate action by the parties to remain consistent with the Services Agreement. All references to JSHI on Schedule 1 shall mean Employer and all references to SVHS on Schedule 1 shall mean Hospital.

Exhibit B-3-1

5.     **Quality Improvement Initiatives**. Employer, through the Participating Physicians, shall also provide services designed to enhance the quality of care delivered through the Service Line (collectively, the "Performance Improvement Initiatives"), available upon request from Physician. The Performance Improvement Incentives will be updated annually or as otherwise permitted by the Services Agreement.

6.     **Payment for Management Services.**

(a)     In General. Employer will receive an aggregate base fee ("Base Management Fee") for the performance of the Management Services under the Services Agreement. To provide for stability of cash flow, Employer will have allocated to it, an equal amount of the aggregate Base Management Fee per month by Hospital for Employer's performance of Management Services, with such amount subject to quarterly and annual reconciliations as set forth in the Services Agreement. Employer will, in-turn, allocate a portion of the aggregate Base Management Fee received by Employer to the IDP to compensate the Participating Physicians for their performance of Management Services (with other portions of the aggregate Base Management Fee received by Employer allocated to pay the compensation for the services of CMO and medical director services performed by cardiovascular surgical physician employees of Employer in accordance with the Services Agreement. The Hospital will evaluate Employer's performance under the Services Agreement. The Employer's Board of Managers will retain ultimate responsibility for Employer's performance under the Services Agreement.

(b)     Allocation of Cardiology Portion of Base Management Fee Allocated to IDP. The portion of the aggregate payment earned by Employer for Management Services that are performed by the cardiology Participating Physicians will be allocated to the IDP, and subsequently distributed to cardiology Participating Physicians. The portion of the Base Management Fee earned by Employer for Management Services that are performed by the cardiology Participating Physicians during 2016 which will be made available to be earned and paid into the IDP (assuming full performance under the Services Agreement) is set at Nine Hundred Thousand Dollars ($900,000), and the portion of the Base Management Fee earned by Employer that will be used to compensate the CMO during 2016 will equal Three Hundred Thousand Dollars ($300,000). The aggregate Base Management Fee earned by Employer for Management Services that are performed by the cardiology Participating Physicians from and after January 1, 2017 will be determined based on an external valuation and based on the fair market value of the Management Services, with such aggregate Base Management Fee to be allocated and used as provided herein and in the Services Agreement (to include allocating a portion of the aggregate Base Management Fee received by Employer to the IDP, allocating a portion to pay the compensation for the services of CMO, and allocating a portion to pay medical director services performed by cardiovascular surgical physician employees of Employer in accordance with the Services Agreement).

(c)     Time and Management Duties and Task Records. Except as otherwise provided in the Services Agreement, each Participating Physicians providing Management Services must complete detailed "Time Records" substantially in the form designated by Hospital, with each such Time Record to include, without limitation, a description of the Management Services, management tasks and duties engaged in during each time period in which Participating Physicians perform reported Management Services. Each Participating Physician will be required to submit to Employer, and Employer will submit to Hospital, the original Time Records and a summary of all time records listing the total number of hours devoted to individual management duties and tasks within the Management Services, and a description of the management duties and tasks described on Schedule 1 that were engaged in and/or accomplished. Participating Physicians shall submit the Time Records to Employer for each month during the term of this Agreement by the fifth (5th) day of the following month. The timely and accurate submission of such Time Records demonstrating the performance of the Management Services, duties and tasks described and in

Exhibit B-3-2

accordance with the Services Agreement is a condition precedent to Hospital's payment of the Base Management Fee to Employer for Management Services, and there will be no allocation of funds for time incurred which is not supported by appropriately completed Time Records.

       (d)     Minimum Hours Requirement. Participating Physicians will continue to be required to provide, in the aggregate, a minimum of 3,797.5 hours of Management Services during 2016 (with such amounts calculated based on a total portion of the Base Management Fee allocated for cardiology Participating Physician Management Services, using the fair market value hourly rate as of the Effective Date of $237.00 per hour (calculated by dividing $900,000 by $237 per hour)). The fair market value hourly rate for subsequent periods will be determined based on an external valuation, with such fair market value hourly rate used to determine the minimum number of hours of Management Services to be provided by the cardiology Participating Physicians for such year by dividing the total portion of the Base Management Fee available to be earned from the performance of Management Services by cardiology Participating Physicians, by the then applicable fair market value hourly rate.

       Employer and Participating Physicians may report on the Time Sheets, actual hours of service (and fractions thereof) in which the Participating Physician performs bona fide Management and Administrative Services under the Employment Agreement and the Services Agreement, to include, without limitation, time the Participating Physicians devotes to Employer Board of Managers, JOC, Council and other committee meetings, and other time the Participating Physicians spend in connection with the performance of other duties and tasks that are within the scope of the Management Services. The Parties understand and agree that the performance of such Management Services during a particular year will most likely require time in excess of the total minimum hours requirement referenced above, but that neither Employer nor the Participating Physicians will receive separate payment for time reported on the Time Sheets during any year which is in excess of the minimum hours requirement. Physician understands and agrees that the full completion and submission of Time Sheets is a necessary requirement to assist Hospital and Employer in validating and documenting Employer's performance of the Management Services under the Services Agreement, and agrees to comply with this requirement.

       (e)     Reconciliation. Base Management Fee payments by Employer into the IDP will be subject to quarterly and annual reconciliation and adjustment based on performance (demonstrated by time and the performance of the duties and tasks under the Services Agreement by the Participating Physicians), and the amount advanced may be reduced based upon inadequate performance. The quarterly and annual reconciliations will be performed within thirty (30) days following the end of each quarter or year during the term of the Services Agreement. For purposes of quarterly reconciliations, no adjustment to the portion of the Base Management Fee received by Employer which is advanced to the IDP for the performance of Management Services by the Participating Physicians will be made unless the aggregate hours reported by such Participating Physicians during the subject quarter or year-to-date period are substantially less (defined as 10%) than the portion of the minimum hours requirement applicable to the measurement period (e.g., if a minimum of 4,000 hours are required to be performed by Participating Physicians during the year and the first quarter is being measured, an adjustment to the portion of the Base Management Fee advanced to the IDP will only be made if less than 900 hours are reported on the Time Sheets of the Participating Physicians during the subject quarter). In the event that a reconciliation determines that an overpayment has been made (including an allocation to the IDP which is in excess of the amount earned), then the amount of overpayment shall be deducted pro-rata from the next three (3) subsequent payments or allocations. In the event that the Services Agreement terminates and an overpayment has been made which has not been recouped as of the termination date, then Employer shall repay the overpayment to Hospital within ten (10)

AR0169 Physician Employment Agreement_Invasive_Conway (Tukaye 17) v5 den

days of notice of same, and recoup the amount of the overpayment from Physician and other Participating Physicians.

(f)       Distributions of Base Management Fee to Participating Physicians.  Each Participating Physician is eligible to receive a portion of payments allocated by Employer to the IDP for the performance of Management Services equal to the total amount of the compensation allocated to the IDP from the performance of Management Services, multiplied by a fraction, the numerator of which is the total number of documented hours (and fractions thereof) time spent by that Participating Physician performing Management Services during the applicable year, and the denominator of which is the total time spent by all Participating Physicians performing Management Services during the applicable year.

Physician must comply with all documentation and other requirements, including those relating to Time Records, described in this Services Exhibit and the Employment Agreement to document the types of Management Services, management duties and tasks, performed by the Participating Physicians and the time spent performing such activities.  For purposes of administering this provision, Employer will allocate a portion of the total portion of compensation allocated by Employer to the IDP on a monthly basis for the payment of Management Services based on an estimate of each Participating Physician's actual hours of Management services, subject to annual reconciliation based on actual hours spent during the respective year.

7.       **Incentive Management Fees Based on Performance Improvement Initiatives.**

(a)       In General.  In addition to the items of Base Management Fee compensation set forth above, Employer shall be eligible to earn an "Incentive Management Fee" for the achievement of Performance Improvement Initiatives under the Services Agreement, pursuant to the terms of the Services Agreement.  The Incentive Management Fee will be paid based on performance in relation to the Performance Improvement Initiatives.  Incentive Management Fee measures will be assessed and reported periodically and awards determined and paid on the schedule set forth in the Services Agreement and on Schedule 2, as applicable to the respective measure.

(b)       Allocation of Cardiology Portion of Incentive Management Fee to IDP.  The portion of the aggregate payment earned by Employer as an Incentive Management Fee based on the performance by Employer's cardiology Participating Physicians will be allocated to the IDP, and subsequently distributed to the cardiology Participating Physicians in accordance with the IDP.  For 2016, the portion of the aggregate Incentive Management Fee earned by Employer the performance by Employer's cardiology Participating Physicians which will be made available to be earned and paid into the IDP (assuming full performance under the Services Agreement), is Six Hundred Thousand Dollars ($600,000).  The aggregate Incentive Management Fee to be made available to be earned and paid into the IDP for each of the subsequent Contract Years will be determined based on an external valuation, with such aggregate fee to be allocated and used as provided herein (to include allocating a portion of the aggregate Incentive Management Fee received by Employer to the IDP, and to pay compensation for services performed by cardiovascular surgical physician employees of Employer in accordance with the Services Agreement).

(c)       Distributions of Incentive Management Fee to Participating Physicians.

The portion of the aggregate payment earned by Employer as an Incentive Management Fee based on the performance by Participating Physicians will be subsequently distributed to the Participating Physicians in accordance with this Services Exhibit; provided, however, that in order to be eligible for any portion of the Incentive Management Fee, Physician shall have no medical record deficiencies which have been outstanding for more than sixty (60) days post-discharge (inpatient) or from the date of service

Exhibit B-3-4

(outpatient), unless an exception has been made by Hospital's Chief Medical Officer for a immaterial deficiency or a deficiency which is reasonably deemed to not be the fault of Physician.

Each Participating Physician shall be eligible for a share of the Incentive Management Fee. Each Participating Physician's share of such Incentive Management Fee shall be equal to the total Incentive Management Fees received by Employer under the Services Agreement, divided by the total number of Participating Physicians actively involved in providing services on behalf of Employer that contributed in some way to achieving the Performance Improvement Initiatives, determined pursuant to the Services Agreement.

8.      Updates to Base Management Fee and Incentive Management Fee. The compensation payable for services performed under the Services Agreement may be subject to annual updates, fair market value requirements, and other terms of the Services Agreement. The maximum available to be paid under the Services Agreement in the form of a Base Management Fee, and the aggregate amount available for payment in the form of the Incentive Management Fee, will be updated annually, as necessary, through a process beginning and ending prior to the effective date of the updated compensation. In connection with each such update, the minimum number of hours of Management Services required to be performed by cardiology Participating Physicians based on the then current fair market value hourly rate as determined by the external valuation, and the specific Performance Improvement Initiatives, associated award measures and amounts will be updated for the next year.

9.      Miscellaneous. Although this Exhibit B-1 is a part of Physician's Agreement with Employer and describes certain rights and obligations between Physician and Employer with respect to the performance of the Services Agreement, Physician is not a third-party beneficiary to the Services Agreement nor is Physician entitled to enforce any rights under the Services Agreement. This Services Exhibit does not alter or convey any rights, limitations, or obligations as between Hospital and Employer under the Services Agreement.

Exhibit B-3-5

**EXHIBIT B-3**

***Services Exhibit***
CRMC Professional Services Agreement

This Services Exhibit sets forth compensation, duties, and other provisions applicable to Physician's services under the Services Agreement described below. The Board of Managers of Employer approved the terms of this Services Exhibit. This Services Exhibit becomes effective on the Start Date. Any capitalized terms not defined herein will have the meaning set forth in Physician's Employment Agreement (the "Employment Agreement") or the Services Agreement, as applicable.

1. **Services Agreement.**    As used herein, the "Services Agreement" means the Independent Contractor Professional Services Agreement between Employer and Conway Regional Medical Center, an Arkansas nonprofit corporation, ("CRMS") ("Hospital"), effective August 1, 2016.

2. **Term.** The term of the Services Agreement has been extended and continues through August 31, 2020, and is subject to renewal or early termination as provided therein.

3. **Participating Physicians.** The Employed Physicians who satisfy the eligibility requirements described below or set forth in the Services Agreement and who are designated by Employer's Vice President/Administrator are eligible to participate in the provision of services under the Services Agreement.

In order to provide professional medical and other services (the "Professional Services") on behalf of Employer under the Services Agreement, an Employed Physician shall be required to be and remain employed by Employer, a party to and in continuous compliance with Physician's employment agreement with Employer, and agree to comply with the provisions of the Services Agreement and the policies and procedures established by Hospital, Employer and the JOC that are applicable to Employed Physicians in connection with the operation of the Service Line. If at any time an Employed Physician fails to meet the criteria set forth above, such Employed Physician shall be immediately removed from the provision of any Professional Services. The Employed Physicians who are eligible to participate under the Services Agreement will be referred to herein as "Participating Physicians."

4. **Professional Services; Other Services.**

(a)     Employer, through the Participating Physicians, shall provide professional medical and related services to Hospital. The Professional Services to be performed by Employer and which may be engaged in by each Participating Physicians, shall consist of the duties and activities described in the Services Agreement and as required by Employer. In the event of an amendment to the Services Agreement, this Services Exhibit will be automatically amended without separate action by the parties to remain consistent with the Services Agreement.

5. **Payment for Professional Services.**

(a)     In General. Employer will receive Production-Based Payment, Group Costs, Supervision Payment, and Lecture Payment for the performance of the Professional Services and related services under the Services Agreement.

(b)     Attributed wRVUs. For services provided under the Services Agreement, the wRVUs performed by the Participating Physicians under the Services Agreement will be allocated to the respective

Participating Physician's wRVU productivity for purposes of calculating Base Compensation payable to the Participating Physician.

Physician must comply with all documentation and other requirements, including those described in this Services Exhibit and the Employment Agreement to document the types of Professional Services and other services performed by the Participating Physicians.

6.    **Updates to Compensation.**  The compensation payable for services performed under the Services Agreement may be subject to annual updates, fair market value requirements, and other terms of the Services Agreement. The maximum available to be paid under the Services Agreement as compensation may be updated annually, as necessary.

7.    **Miscellaneous.**  Although this Exhibit B-3 is a part of Physician's Employment Agreement with Employer and describes certain rights and obligations between Physician and Employer with respect to the performance of the Services Agreement, Physician is not a third-party beneficiary to the Services Agreement nor is Physician entitled to enforce any rights under the Services Agreement. This Services Exhibit does not alter or convey any rights, limitations, or obligations as between Hospital and Employer under the Services Agreement.

## SCHEDULE 1

Not Applicable

## SCHEDULE 2

**Not Applicable**

**EXHIBIT C**
*Compensation*

**Section 1.** **Defined Terms.** Capitalized terms used in this Exhibit C shall have the meanings set forth below, or elsewhere in this Exhibit C or the Agreement.

"Board" shall mean Employer's Board of Managers.

"Contract Year" shall mean each full or partial year that ends on June 30, such that Physician's Contract Year corresponds to those of all other Employed Physicians. Any amounts due to Physician during a partial Contract Year shall be prorated.

"Conversion Factor" shall mean $57.50.

"Employed Physicians" means all physicians in the Specialty who are employees of Employer, including New Physician Employees. Upon the termination of employment of Physician for any reason, Physician will cease to be an Employed Physician for purposes hereof.

"IDP" shall mean that certain "internal distribution plan" which is attached as Exhibit C-1, as may be amended from time to time as provided in Section 8 below, which sets forth the methodology under which amounts allocated to the IDP will be distributed among the Employed Physicians as compensation for their services during each Contract Year.

"Management/Professional Services" shall mean the various services provided by Employer in connection with one or more Services Agreements as described on a Services Exhibit.

"New Physician Employees" shall mean those Employed Physicians in the Specialty of Employer who (i) are assigned by Employer to staff clinical facilities, work in conjunction and share a practice with the other Employed Physicians, (ii) have been approved by Employer's Board of Managers and become an employee of Employer after the Start Date, and (iii) have not yet completed their first full year of employment by Employer as an Employed Physician.

"Non-Physician Individual" shall mean those nurse practitioners and/or physician assistant providers who are licensed in the State of Arkansas, enrolled and eligible to bill for professional services under the Medicare, Medicaid, and other Federal Health Care Programs, and who are assigned by Employer to work in conjunction and share a practice with the Employed Physicians (other than New Physician Employees) during each respective Contract Year. In addition, Non-Physician Individual includes any unlicensed individual (e.g., scribe) that has been assigned to an Employed Physician (other than a New Physician Employees).

"Non-Physician Direct Expenses" shall mean the actual direct expenses which are incurred by Employer for the payment of compensation, benefits, and other specific expenses (e.g., licensure, continuing education allowance, etc.) for the Non-Physician Individual who are assigned by Employer to work in conjunction and share a practice with the Employed Physicians based on their assigned time commitment during each Contract Year.

"Outreach and Training Credit" shall mean four and 75/100 (4.75) *wRVUs* per hour for Outreach and Training Services performed by Physician, or other amount agreed upon by Employer (with the approval of Employer's Vice President/Administrator and the CMO) for the provision of such services.

"Outreach and Training Services" shall mean time spent in developing outreach clinics at Employer's request and attending training seminars, sessions, and/or events to enhance and/or increase the level of services provided by Physician through Employer. Outreach and Training Services shall include approved travel time associated with developing outreach clinics and attending training seminars, sessions and/or the events described above. All Outreach and Training Services, including without limitation, the nature, length, and parameters around travel time shall be approved in advance by the Board of Employer.

"Pass Through Amounts" shall mean any of the following amounts received by Employer during a given Contract Year:

(i)   Amounts which are attributed to Physician's performance of activities and services required to obtain physician-specific incentive payments from Medicare, Medicaid or other payors for e-prescribing, payments made under the Physician Quality Reporting System, Electronic Health Record "meaningful use" incentives and any other physician-specific incentive payments as designated by Employer (with the approval of the Board);

(ii)   Amounts received by Employer for investigator or other research services performed by SVHS or Employer under research study or similar agreements administered by Employer under which Physician serves as the investigator (collectively "JSHI Research Agreements"), net of direct costs incurred by Employer in performing the duties and obligations of Employer under all such Research Agreement(s) or otherwise in connection with the operations of the research department;

(iii)   Amounts received by Employer for investigator or other research services that are attributable directly to Physician's personally-performed services under research study or similar agreements not administered by Employer (collectively "CIRI Research Agreements");

(iv)   Amounts payable for EKG reads personally performed by Physician which are performed at and paid for by hospitals or facilities other than SVHS or SVHS affiliates; and

(v)   Any additional payments for services which are outside of Physician's duties under this Agreement which are approved in advance by Employer and following the completion of any third party valuation or other review deemed necessary by Employer.

"Quarterly IDP Allocation Reconciliation" shall mean a reconciliation to be completed following the completion of each three-month period during a Contract Year during the Term, which compares the aggregate amount of compensation earned by the Employed Physicians during such period in question to the total amount actually allocated by Employer to, and paid by, the IDP during the respective period.

"wRVUs" shall mean the work relative value units (CMS RBRVS method) for professional services. Employer will use the applicable year CMS RBRVS values to calculate wRVU values, except as provided herein. New procedures with wRVU assignments will be valued at the value assigned during the first year of use by CMS. The wRVU value of procedures without wRVUs assigned by CMS will be calculated as set forth in the MGMA Physician Compensation and Production Survey by dividing the total gross charges for the unvalued procedures, by the Employer's known average charge per wRVU for all procedures which are listed and valued, with

such calculated value to be used until a value is assigned by CMS, after which the CMS-assigned value will be used. In the event any procedure is subsequently bundled involving a single, combined payment for hospital and physician professional services, then the initial *wRVU* value for such procedure as determined hereunder will continue to apply. Physician will receive *wRVU* credit for purposes of this Agreement for all professional services of Physician which are performed for Employer using Medicare assigned wRVU values, to specifically include EKG interpretations performed for SVHS and its Affiliates (but excluding EKG reads personally performed by Physician which are performed at and paid for by hospitals or facilities other than SVHS or an Affiliate. which constitute "Pass Through Amounts" as defined above).

### Section 2. Compensation Paid Directly to Physician

Employer will pay the following amounts directly to Physician (rather than allocating such amounts to the IDP), subject to withholds, deductions, expenses, or other provisions of this Agreement:

(a)    Physician is a New Physician Employee. From the Start Date through twenty-four (24) months following the Start Date, Physician shall be paid a base salary equal to Five Hundred Fifty Thousand Dollars ($550,000), plus Incentive Compensation, if any.

Beginning on the twenty-fifth (25th) month following the Start Date, Physician shall be paid a base salary equal to Two Hundred Thirty-Five Thousand Dollars ($235,000), plus Incentive Compensation, if any.

For purposes of this Agreement, the term "Incentive Compensation" means Physician's actual wRVUs in excess of (i) 9,565 for the first 24 months following the Start Date; and (ii) 4,260 for months 25-36 following the Start Date, multiplied by $57.50.

Following the 36th month from the State Date, Physician will be paid a "Draw" as described in Section B(i) of Exhibit C-1.

(b)    Signing Bonus. Provided that (i) Physician is and remains in compliance with all of his or her obligations hereunder; (ii) following execution of this Agreement and all related agreements; and (iii) provided that Physician approval of the applicable Visa application, Employer shall provide a "signing bonus" to Physician in the amount of Twenty-Five Thousand Dollars ($25,000.00) within ten (10) business days' notice of receipt of applicable Visa. If Physician fails to begin his or her medical practice on or before the Start Date, or otherwise fails to meet his or her obligations under this Agreement, all signing bonus amounts paid to Physician, if any, shall be immediately due and payable to Employer, with interest, except for any amounts that previously have been forgiven as hereinafter provided.

Simultaneously with the receipt of all or a portion of the Signing Bonus, Physician shall execute a promissory note in substantially the form of Exhibit F hereto (the "Signing Advance Note"), the principal balance of which shall not exceed Twenty-Five Thousand Dollars ($25,000.00). The Note shall accrue interest at the annual rate of four and one-quarter percent (4.25%) as of the date of execution of the Note. Principal on the Note, along with interest on the unpaid balance, shall be repaid in equal monthly installments over a 12-month term, beginning on the Start Date, and shall continue thereafter on a monthly basis. Notwithstanding, repayment shall be subject to the forgiveness provisions set forth below.

Upon each monthly payment date of the Note, and provided that Physician remains employed by Employer and has not issued notice of termination of the Agreement, Employer will forgive the payment of principal and interest on the Note due on that date.

If Physician fails to begin his or her medical practice on or before the Start Date, or otherwise fails to meet his or her obligations under this Agreement, all amounts advanced to Physician shall be immediately due and payable to Employer, plus accrued interest, less amounts previously forgiven or repaid. In addition, forgiveness of the Note shall cease upon the occurrence of any of the following events, and all amounts due thereunder at such time shall be immediately due and payable to Employer: (i) Physician's employment with Employer is terminated for any reason (other than Physician's death or permanent disability rendering Physician unable to provide the professional medical services contemplated hereunder); or (ii) breach by Physician of any material term, covenant, or condition hereof, which breach is not remedied within fifteen (15) days of notice thereof. Upon full forgiveness of the Note, Physician's obligation to make any payment with respect to the Note shall terminate.

Amounts provided to Physician hereunder shall be treated as income to Physician for tax purposes to the extent required by law. Employer shall report all such payments to Physician as income when and as forgiven, unless otherwise required by law. The provisions of this Section shall survive the expiration or termination of this Agreement for any reason.

(c)     Relocation Expenses. Subject to the conditions set forth herein, Employer shall reimburse Physician for expenses relating directly to Physician's relocation, in an amount up to, but not to exceed, Ten Thousand Dollars ($10,000), contingent upon receipt of adequate documentation of such expenses as determined in Employer's reasonable discretion. Physician's relocation, including payment/reimbursement of moving expenses, shall be in accordance with the requirements Catholic Health Initiatives' Relocation Program.  All such expenses must be documented to Employer's satisfaction and amounts provided to Physician hereunder shall be treated and reported as income to Physician, to the extent required by law.  In the event that Physician's employment is terminated by Employer for cause, or by Physician without cause, prior to the first anniversary of the Start Date, Physician agrees to repay Employer the relocation expense reimbursement received by Physician.

(d)     Immigration-Related Expenses.  In the event that Employer agrees to sponsor Physician in connection with his or her obtaining a permanent residency as set forth in Exhibit G, Section 2, Employer will be responsible for all costs (including reasonable attorneys' fees) associated with obtaining and retaining necessary immigration-related documents and approvals up to a maximum amount of Ten Thousand Dollars ($10,000).  In the event Physician retains his or her own attorney for the permanent residence process pursuant to Exhibit G, Section 3, any costs charged by Physician's attorney must be pre-approved by Employer and documented to Employer's satisfaction.  All amounts paid to or on behalf of Physician hereunder may be reported as taxable income to Physician to the extent allowed by law.

### Section 3.  Compensation Allocated to IDP

During each Contract Year of the Term, Employer will allocate the following amounts to be distributed through the IDP, which aggregate amount shall be used to pay annual compensation to Physician and all other Employed Physicians, subject to withholds, deductions, expenses, or other provisions of this Agreement:

(a)     Base Compensation in an amount equal to the total number of wRVUs attributable to the professional medical services of each Employed Physician (other than a New Physician Employee) and each assigned Non-Physician Individual multiplied by the applicable Conversion Factor, and subtracting from the result thereof the Non-Physician Direct Expense.  Notwithstanding the foregoing, upon a Reduction Event (as defined below) with respect to any Employed Physician (other than a New Physician Employee), the Base Compensation allocated to the IDP for the Employed Physician subject to Reduction Event during any six (6) month period during the Term shall not be less than seventy percent (70%) of the Employed Physician's Base Compensation during the immediately preceding six (6) full months prior to

the Reduction Event. A "Reduction Event" means an event or decision that is outside the control or influence of the Employed Physicians that causes a "material decrease" in an Employed Physician's *wRVU* production. "Material decrease" shall mean a reduction in an Employed Physician's *wRVU* production of thirty percent (30%) or greater within a six (6) month period. For illustrative purposes, a Reduction Event includes, without limitation, the following examples: (i) cessation of the provision of cardiology services CHI St. Vincent North hospital; (ii) Employer discontinues a managed care agreement with a payor that represents a significant portion of Employer's payor mix; and (iii) other significant events that are outside the control or influence of the Employed Physicians that reduces an Employed Physician's *wRVU* production. Base Compensation will be estimated based on a running (annualized) total of wRVUs throughout each Contract Year and subject to the Quarterly IDP Allocation Reconciliation;

(b)     Payments (including for performance of Management/Professional Services and incentive payments) earned by Employer under all Services Agreements and which (if earned) will be allocated to participating Employed Physicians under the IDP in accordance with the applicable Services Exhibit;

(c)     Pass Through Amounts;

(d)     Outreach and Training Credits earned by Employed Physicians; and

(e)     Other forms of compensation allocated to the IDP as described in this Compensation Plan.

**Section 4. Payment of Physician's Compensation; Quarterly IDP Reconciliation.**

(a)     Payment of Physician's Compensation. All compensation paid to Physician in accordance with the Employer's normal payroll policies and practices and, for compensation allocated to the IDP, shall be allocated and distributed among Employed Physicians in accordance with the IDP.

(b)     Quarterly IDP Allocation Reconciliation. Within thirty (30) days of the end of each three (3) month period during a Contract Year, Employer shall perform a reconciliation of the amounts properly allocated to the IDP during such three (3) month period. Employer agrees to pay to Physician any amounts due to Physician within fifteen (15) days following the completion of the calculation. In the event Physician has been paid compensation in excess of that provided for, or is delinquent on the repayment of any debt to Employer, Physician hereby authorizes Employer to deduct any overpayment or debt pro rata from the next payments, if any, due to Physician during the following three (3) months, and following such three (3) month period Physician shall repay within ten (10) days any amounts not so recovered to Employer. Upon termination of this Agreement and following a final accounting/reconciliation to be completed within thirty (30) days following the termination date, any amounts owed by either party to the other shall become immediately due and payable within ten (10) days of notice of the results of such accounting/reconciliation.

(c)     Withholdings. Employer shall deduct from all compensation due Physician hereunder all sums required to be withheld for federal, state, or local taxes, surcharges, or other mandated withholdings with respect to Physician's compensation.

(d)     Proration. In the event that this Agreement terminates or is terminated during a Contract Year, the amounts stated herein shall be prorated accordingly.

**Section 5.     Compensation Review for Reasonableness.**

(a)     Individual Physician. The total annual aggregate compensation received by Physician hereunder (including all amounts provided to Physician and reportable as taxable income) shall not exceed one hundred fifty percent (150%) of the ninetieth (90th) percentile for physicians in the Specialty (the "Cap")

based on standardized benchmarking (i.e., using the same or similar methodology as was used by Employer prior to the Start Date of this Agreement) unless Physician's compensation in excess of the Cap is determined to not exceed fair market value as follows:

(i)     In the event that Physician's compensation is projected to exceed the Cap, Employer will conduct an external valuation and review of medical necessity using one or more firms with expertise in physician compensation valuation and the evaluation of the medical necessity of cardiology services, in order to consider Physician's productivity and the medical necessity of services included within such productivity (with such medical necessity review to be based on a sample determined appropriate by the external firm conducting the medical necessity review). Upon such completion of such medical necessity review, if any services of Physician were disqualified due to lack of medical necessity, the firm conducting the external compensation valuation will determine whether Physician's compensation projected to exceed the Cap will be within fair market value by considering the findings from the medical necessity review.

(ii)    In the event the valuation concludes that Physician's projected compensation in excess of the Cap would not exceed fair market value, the Cap will not apply to Physician's compensation for the particular Contract Year to the extent consistent with the valuation.

(iii)   In the event the valuation concludes that Physician's projected compensation (if in excess of the Cap) would exceed fair market value, the Cap will apply. In the event that the application of the Cap results in a reduction of compensation which would otherwise be payable to Physician notwithstanding the Cap of more than five percent (5%), Physician may elect to terminate this Agreement in accordance with the time periods specified in Section 7.5, but such termination shall not provide Physician with any separate remedy or right to damages due to termination of the Agreement.

(iii)   If Physician's compensation is project to exceed the Cap based on the first two Contract Year quarters, Employer will use its best efforts to complete the medical necessity review and valuation and inform Physician of the results by the end of the third quarter.

Notwithstanding the foregoing, the parties agree that pursuant to that certain HealthCare Appraisers, Inc., report number 2478-025 for Analysis Cardiology Employment Arrangements for Jack Stephens Heart Institute, LLC (the "Aggregate Compensation Valuation"), the projected compensation to be earned and paid to Physician as of the Start Date is deemed to be within FMV, even if such aggregate amount is projected to be in excess of the Cap. In addition, so long as the aggregate compensation earned by Physician during each annual period between the Start Date and June 30, 2019 (the last date upon which the Aggregate Compensation Valuation may be relied upon) is less than the aggregate amount set forth for Physician under the Aggregate Compensation Valuation, then such compensation will not be deemed to have exceeded the Cap so as to be subject to the independent valuation requirements of this Section 5(a). In the event, however, that the aggregate compensation allocated to Physician exceeds the amount set forth in the Aggregate Compensation Valuation, then the provisions of this Section 5(a) shall apply (to include requirements related to external valuation, medical necessity review and potential modification of compensation amounts by Employer).

(b)     Compensation Plan Review. To ensure ongoing regulatory compliance, after this Agreement has been in force for thirty (30) months, Employer may, at its option, engage a third party valuation firm with expertise in physician compensation for services in the Specialty to assess compensation projected to be paid under this Agreement into the IDP during Contract Years four and five to confirm that such compensation is consistent with fair market value and commercially reasonable. Any findings from those valuations will be a basis for modifications to such compensation in order to eliminate any identified

C-6

risk of overpayment. In the event that such modifications result in a reduction of the allocation to the IDP which is projected to reduce compensation payable to the Employed Physicians by more than five percent (5%), such reduction shall require the approval of the Employer and no less than seventy-five percent (75%) of the Employed Physicians, in which case Physician agrees that this Agreement shall be automatically amended without Physician's separate consent or signature.

(c)     Medical Necessity. Employer shall engage, at its sole cost and expense, an independent evaluator to conduct a medical necessity review of Physician as provided in Section 5(a) or in the event that Physician's personal wRVU production exceeds one hundred fifty percent (150%) of the ninetieth (90th) percentile for physicians in the Specialty based on national reports or surveys maintained by national associations with expertise in physician compensation.

### Section 6.     Compensation Renegotiation.

(a)     Triggering Event. In the event that, during the Term, external reimbursement from the Centers for Medicare & Medicare Services ("CMS") for cardiology physician professional services decreases by thirty percent (30%) from the level of reimbursement paid for such services in 2016, then the wRVU Conversion Factor for the current Contract Year and each subsequent Contract Year will be renegotiated. The parties agree that this safeguard is meant to cover significant changes in CMS reimbursement rather than volume variances relative to market capture assumptions. An annual evaluation will be completed and in the event that such annual evaluation reveals a thirty percent (30%) decrease, then Employer will provide written notice to Physician and the other Employed Physicians that a triggering event has occurred, and the compensation structure will be renegotiated and amended in accordance with the process described in Section 6(b) below.

(b)     Negotiation Process and Timeline. Upon the occurrence of a triggering event in accordance with Section 8(a) above, the Employed Physicians will name a subcommittee comprised of no less than three (3) and no more than five (5) Employed Physicians. The subcommittee will meet with representatives of Employer's Board of Managers (excluding any board member who is a physician employee of Employer) and their designee (to include appropriate SVHS representatives) in an effort to attempt to agree on a new compensation structure and an amendment to this Agreement. Any such amendment shall require the approval of the Employer and no less than seventy-five percent (75%) of the Employed Physicians, in which case Physician agrees that this Agreement shall be automatically amended without Physician's separate consent or signature.

**Section 7.     Disputes.** In the event there is a dispute between the parties hereto regarding the calculations of amounts due to Physician or Employer, then the parties shall agree on an independent certified public accountant to calculate the amounts due hereunder and such calculation shall be binding on both parties with respect to the mathematical calculations (but not as to the interpretation of this Agreement).

**Section 8.     Adoption and Changes to IDP.** The IDP set forth on Exhibit C-1 has been agreed upon and implemented in order to promote certain work allocation, cultural and other objectives related to the organization and operation of the physicians' collective cardiology practices. By becoming a party to this Agreement, Physician agrees to be and remain subject to the IDP, and Physician further consents and agrees to be bound by any amendment to the IDP, as adopted and approved from time to time, by the approval of at least seventy-five percent (75%) of the Employed Physicians, without Physician's separate consent or signature on such amendment. Any amendment to the IDP so approved shall be incorporated into this Agreement without further action of the parties.

**EXHIBIT C-1**
*Internal Distribution Plan*

Introduction. This Exhibit C-1 sets forth the Internal Distribution Plan ("IDP") and methodology under which amounts allocated to the IDP by Employer will be distributed among the Employed Physicians as compensation for their services during each Contract Year.

Section 1.     Distribution of Base Compensation. Aggregate funds allocated to the IDP by Employer in the form of Base Compensation shall be distributed among the Employed Physicians (other than the New Physician Employees) in the following manner as "Base Compensation":

A.     Calculation of Base Compensation. Subject to reduction as provided in Section 2A below, Employed Physicians will be paid Base Compensation in the amount equal to the greater of:

(i)     The total number of wRVUs generated by such Employed Physician for professional services personally performed plus wRVUs generated by a Non-Physician Individual (excluding any wRVUs for services involving ancillary services and amounts that would trigger the prohibitions under 42 U.S.C. § 1395nn, including "designated health services") assigned to Employed Physician (based on the assignment percentage), multiplied by the Conversion Factor; or

(ii)     The amount of Base Compensation allocated to the IDP for an Employed Physician who is affected by a Reduction Event as described in Section 2(a) of Exhibit C.

B.     Payout of Base Compensation and Reconciliation. In each Contract Year, each Employed Physician shall be assigned a "Draw" which shall generally be set at eighty percent (80%) of such Employed Physician's projected Base Compensation for such Contract Year, based upon Physician's productivity in the prior Contract Year. Employer will conduct the reconciliation described in Exhibit C, and will concurrently conduct a reconciliation of the amounts due to each Employed Physicians under this IDP and amounts paid to the Employed Physician in the form of a Draw.

i.     If an Employed Physician has earned Base Compensation in excess of such Employed Physician's Draw in accordance Section 1(A) above, then the Employed Physician shall receive the difference between the Base Compensation earned by the Employed Physician and the aggregate Draw payments made to the Employed Physician during such time period, in accordance with the time periods set forth in Exhibit C.

ii.     If such reconciliation shows that the aggregate Draw payments made to the Employed Physician were greater than the Base Compensation earned by such Employed Physician during such time period, including any overcharges or corrections (a "Shortfall"), then Draw payments made to the Employed Physician in the immediately ensuing quarter shall be proportionately reduced in order to recoup the Shortfall; and, in connection therewith, the Employed Physician shall not be entitled to receive payments of Base Compensation in such period unless Base Compensation earned by the Employed Physician in such period exceeds the aggregate amount of unadjusted Draw payments that would have been made to the Employed Physician, absent deductions for the Shortfall.

iii.     In the event the Employed Physician earns Base Compensation in such period which is in excess of the Employed Physician's unadjusted Draw in such period,

then the Employed Physician's Draw in the next succeeding three (3) month period will be reset to the Employed Physician's full, unadjusted Draw amount.

C.     Non-Physician Expenses; Other Expenses.

        i.      Notwithstanding anything hereto to the contrary, if the determination of an Employed Physician's Base Compensation includes an allocation of wRVUs that are performed by a Non-Physician Individual assigned to an Employed Physician, then all Non-Physician Direct Expenses attributed to such Non-Physician Individual shall be deducted from Base Compensation payable to the Employed Physicians to whom the Non-Physician Individual is assigned by Employer based on FTE assignment.

        ii.     In the event any expenses reimbursed by Employer under the second sentence of Section 3.5 of the Agreement are determined upon audit or other examination to not be allowable for tax purposes then Physician shall repay to Employer the amount of such disallowed compensation or expenses or both.

Section 2.     Call Coverage Pools.

        A.     Call Coverage. A separate pool of funds (the "Call Coverage Pool") will be created by multiplying the number of wRVUs which are personally performed by Employed Physicians (other than New Physician Employees) who are excluded from call coverage obligations ("Excluded Physicians") by the per wRVU amount agreed upon by the Board and the Excluded Physician prior to his or her exclusion from call coverage obligations. The funds allocated to the Call Coverage Pool will be allocated on an hourly basis among Employed Physicians who take additional call (to cover call coverage requirements of Excluded Physicians, as determined by Employer) in accordance with Section 2(B) below, with any amounts not distributed from the Call Coverage Pool on such basis, to be distributed through the "Travel Time Pool" described in Section 2(F) below.

        B.     Allocation of Compensation. For purposes of this provision the Board of Managers of Employer, with the input of the CV CMO, shall determine what incidents of on-call services will constitute additional on-call services. Each Employed Physician providing additional on-call services shall receive compensation on an hourly basis at the rate of $71 per hour, or other amount agreed upon by Employed Physician and Employer, based on the respective call schedule of additional on-call services performed (e.g., X hours for evening, Y hours for weekend, etc.). Amounts allocated to the Call Coverage Pool that are not allocated on an hourly basis on the provision of additional on-call services as provided herein will be allocated to the Travel Time Pool. In the event that the amount to be allocated for additional call exceeds the total available in the Call Coverage Pool, then the amount in the Call Coverage Pool will be allocated on a percent to total basis based on the number of hours of additional on-call service provided by each respective Employed Physician.

        C.     Travel Time Pool.  Amounts allocated to the Call Coverage Pools during each Contract Year that are not allocated in accordance with Section 2(B) above, will be allocated to the Travel Time Pool, and allocated among the Employed Physicians based on a fraction, the numerator of which will equal the "Drive Time Hours" incurred by the respective Employed Physician engaged in travel to outreach ambulatory clinic locations, and the denominator of which will equal the sum of all Drive Time Hours for all Employed Physicians during the respective period.

Section 3.     Distribution of Fees Paid Under a Services Agreement.

A.     Base Fee.  One or more Employed Physicians may receive a portion of payments allocated by Employer to the IDP as a result of services provided by the Employed Physicians under a Services Agreement.  Compensation received for such services will be allocated to and distributed through the IDP as described on the Services Exhibit for the particular Services Agreement. For clarity, not all Employed Physicians may participate in the performance of services (or receive compensation allocated to the IDP for) every Services Agreement.  Each Employed Physician must comply with all documentation and other requirements described in the applicable Services Exhibit, to document the types of Management/Professional Services, management duties and tasks, performed by the Employed Physician and the time spent performing such activities.

B.     Incentive Payments.  In addition to and not in limitation of the foregoing, in the event that Employer earns incentive payments under a Services Agreement which are allocated to the IDP under the applicable Services Exhibit, the incentive payments will be allocated as provided in the applicable Services Exhibit. For clarity, not all Employed Physicians who participate in a Services Agreement may share in incentive payments under that Services Agreement.

Section 4.     Payments of Certain Pass Through Amounts.  Any payments made to Employer in the form of "Pass Through Amounts" shall be distributed to the Employed Physician who have provided services, taken necessary actions or otherwise provided meaningful assistance to Employer in connection with Employer meeting all of requirements necessary to qualify for and receive such Pass Through Amounts.  Pass Through Amounts will be distributed:

A.     In the case of Pass Through Amounts that are specifically allocable and earned based on the performance of an Employed Physician, directly to the Employed Physician; and

B.     In the case of Pass Through Amounts that are not specifically allocable and earned based on the performance of an Employed Physician, on a pro-rata basis among all Employed Physicians who qualify for receipt of such Pass Through Amounts by providing services, taking necessary actions or otherwise providing meaningful assistance to Employer in connection with Employer meeting all of requirements necessary to qualify for and receive such Pass Through Amount.  For purposes of this provision Employer will be entitled to consult with the Employed Physicians who are Physician Managers on the Employer Board of Managers to determine which Employed Physicians qualify for such Pass Through Amounts by having "provided services, taken necessary actions or otherwise provided meaningful assistance to Employer in connection with Employer meeting all of requirements necessary to qualify for and receive such Pass Through Amounts", and Employer will be entitled to rely on the decision of a majority of such Physician Managers.  In the absence of such a majority decision, Employer shall be entitled to assume that each Employed Physician qualified to receive such Pass Through Amounts for purposes of determining each physician's allocated share of Pass Through Amounts within the IDP.

Section 5.     Outreach and Training Services.  Any Outreach and Training Credit owed to an Employed Physician for Outreach and Training Services shall be allocated directly to the Employed Physician who provides such Outreach and Training Services for purposes of calculating his or her Base Compensation in any Contract Year.  The aggregate amount of Outreach and Training Credit allocated to Employed Physicians shall not exceed Five Thousand (5,000) wRVUs during any Contract Year.

Section 6.     Research Activities.

A.     In connection with a CIRI Research Agreement, Employer will allocate to the IDP the "CIRI Research Agreement Allocation," if any, which equals (i) amounts received in connection with Research Agreements that are not billable to any public or commercial insurer, (ii)

minus any expenses incurred by Employer in connection with the Research Agreement, (iii) minus any amounts payable as Pass Through Amounts.

B.     In connection with a JSHI Research Agreement, Employer will allocate to the IDP in the form of a "JSHI Research Agreement Allocation," amounts which constitute Pass Through Amounts under the definition of Pass Through Amounts in subsection (ii) of Exhibit C hereof from the performance under JSHI Research Agreements. In the event that Physician provides services as the principal investigator under a JSHI Research Agreement or otherwise is primarily responsible for discharging the obligations that require the services of a physician under such JSHI Research Agreement, then the Physician performing such services shall be allocated a portion of the total JSHI Research Agreement Allocation. The amount so allocated shall equal the total Research Agreement Allocation during the respective Contract Year, multiplied by a fraction, the numerator of which is the total fees paid under Research Agreements under which Physician is the principal investigator or otherwise is primarily responsible for providing physician services, and the denominator of which is the total of all fees and payments made to Employer under all Research Agreements. Subject to quarterly reconciliation, the CIRI Research Agreement Allocation will be distributed to Employed Physicians in a pro rata distribution based upon the amount of time each physician performs in connection with CIRI Research Agreements, documented by Time Records as required by Employer.

C.     The "JSHI Research Agreement Allocation" shall mean the total gross revenues received by Employer under all applicable JSHI Research Agreements, minus direct costs incurred by Employer in performing the duties and obligations of Employer under all such JSHI Research Agreement(s) or otherwise in connection with the operations of the Employer Research Department (the "Research Overhead"). For purposes of administering this provision, Employer's Board of Managers will determine reasonable Research Overhead allocations. The Board will determine which Physicians qualify for such a portion of the JSHI Research Agreement Allocation as a result of the performance of principal investigator or similar services as necessary to qualify for and receive a portion of the JSHI Research Agreement Allocation.

Section 7.     Allocations. Employer will allocate the funds earned and allocated to the IDP in good faith based on Employer's reasonable interpretation of this IDP. In the event that the calculations performed hereunder would result in aggregate payments from the IDP during a subject Contract Year which exceed the total amount allocated to the IDP by Employer during the Contract Year, then Employer shall allocate the total funds in the IDP among the Employed Physicians based on the percent to which each individual Employed Physician's calculated compensation bears to the aggregate calculated compensation of all Employed Physicians.

**EXHIBIT D**
*Omitted*

**EXHIBIT E**
*Additional Provisions*

The following sections are incorporated by reference into the Agreement and are made fully a part thereof. Any ambiguity or conflict shall be resolved in favor of these Additional Provisions.

1.1   Compliance with CHI Standards of Conduct. Physician recognizes that it is essential to the core values of Employer and its Affiliates that all persons and entities employed by or otherwise contracting with Employer at all times conduct themselves in compliance with the highest standards of business ethics and integrity and applicable legal requirements, as reflected in the *Catholic Health Initiatives ("CHI") Standards of Conduct*, as amended from time to time. As of the Effective Date of the Agreement, the *CHI Standards of Conduct* are set forth in *Our Values & Ethics at Work Reference Guide* ("Reference Guide"), which is available at the following website:

http://www.catholichealthinitiatives.org/corporate-responsibility

Physician acknowledges that Physician has electronically accessed, obtained or otherwise received a copy of the Reference Guide and has read and understands the same, and hereby agrees that, so long as the Agreement remains in effect, Physician shall act in a manner consistent with, and shall at all times abide by, such *Standards of Conduct*, to the extent the same are applicable to Physician in the performance of the Agreement.

1.2   *Ethical and Religious Directives*. Physician agrees that his/her performance under the Agreement shall be in accordance with the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the United States Conference of Catholic Bishops, as amended from time to time, and as interpreted by the local bishop (the "*Directives*"). As of the date of the Agreement, the *Directives* are available at the following website:

http://www.usccb.org/

In the event that Employer determines in good faith that Physician has failed to comply with his/her obligations pursuant to Section 1.2 of this Exhibit, Physician shall be considered to be in material breach of the Agreement.

1.3   Excluded Provider and Indemnification. Physician represents and warrants that he/she is not now and at no time has he/she been excluded from participation in any state or federally funded health care program, including Medicare and Medicaid (collectively referred to as "governmental health care program"). Physician further warrants that he/she will not engage in behavior during the Term of this Agreement that leads to his/her exclusion from any governmental health care program.   Physician agrees to immediately notify Employer of any threatened, proposed, or actual exclusion of Physician from participation in any governmental health care program during the Term of the Agreement. Notwithstanding anything to the contrary contained herein, in the event that Physician is excluded from participating in any governmental health care program during the Term of the Agreement or, if at any time after the Effective Date of the Agreement, it is determined that Physician is in breach of this Section, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Physician agrees to indemnify and hold Employer and its Affiliates harmless against all actions, claims, demands, and liabilities, and against all loss, damage, costs, and expenses, including reasonable attorneys' fees, arising directly or indirectly out of any violation of this Section by him/her or due to his/her exclusion from a governmental health care program.

1.4   Insurance.   Employer shall, at its sole cost and expense, procure, keep, and maintain throughout the Term of the Agreement, insurance coverage in the minimum amounts of: One Million Dollars ($1,000,000) per occurrence and One Million Dollars ($1,000,000) annual

E-1

aggregate for commercial general liability; One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) annual aggregate for professional liability or the primary professional liability coverage required under any state mandated patient compensation fund and with participation in the excess liability fund thereunder; One Million Dollars ($1,000,000) per each and every occurrence for automobile liability; and applicable state statutory limits for workers' compensation. In addition to the coverages specifically listed herein, Employer shall maintain any other usual and customary policies of insurance applicable to the work being performed by Physician pursuant to the Agreement. Said policy(ies) shall cover all of Physician's services hereunder. By requiring insurance herein, Employer does not represent that coverage and limits will necessarily be adequate to protect Physician, and such coverage and limits shall not be deemed as a limitation on Physician's liability under the indemnities granted to Employer in the Agreement, including any exhibits.

1.5 Jeopardy. Notwithstanding anything to the contrary herein contained, in the event the performance by either party of any term, covenant, condition or provision of the Agreement jeopardizes the licensure of Employer or its Affiliates, their participation in or the payment or reimbursement from, Medicare, Medicaid, Blue Cross or other reimbursement or payment programs, Employer or its Affiliates' full accreditation by The Joint Commission or any other state or nationally recognized accreditation organization, or the tax-exempt status of Employer or its Affiliates, any of their respective property or financing (or the interest income thereon, as applicable), or will prevent or prohibit any physician, or any other health care professionals or their patients from utilizing Employer or its Affiliates or any of their respective services, or if for any other reason said performance should be in violation of any statute, ordinance, or be otherwise deemed illegal, or be deemed unethical by any recognized body, agency, or association in the medical or hospital fields, Employer may at its option (i) terminate

the Agreement immediately; or (ii) initiate negotiations to resolve the matter through amendments to the Agreement and, if the parties are unable to resolve the matter within thirty (30) days thereafter, Employer may, at its option, terminate the Agreement immediately.

1.6 Confidential and Proprietary Information. During the Term of this Agreement, Physician shall have access to Employer's confidential and proprietary information as defined below. Physician recognizes and acknowledges that all of Employer's confidential and proprietary information shall remain confidential and shall remain the sole property of Employer. For purposes of this Agreement, the terms "confidential and proprietary information" shall include, without limitation, Employer or its Affiliates' trademarks, service marks, patient lists, patient records (including those generated by Physician for Employer), computer programs, business strategies for developing new patient and new physician relationships, including physician recruitment cost data, utilization review techniques, medical management, quality assurance protocols, patents, trade secrets, know-how and other proprietary processes, and such proprietary information included in manuals or memoranda, as they may now exist or may be developed during the Physician's employment. Physician shall not, during or after the Term of employment by Employer, in whole or in part, disclose such confidential and proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall Physician make use of any such property for Physician's own purposes or for the benefit of any person, firm, corporation or other entity (except Employer) under any circumstances during or after the Term of Physician's employment; provided, however, that after the Term of employment these restrictions shall not apply to secrets, know-how and processes which are then generally known to the public, (provided that the Physician was not responsible, directly or indirectly, for such secrets, know-how or processes entering the public without Employer's consent). However, this paragraph shall not prevent Physician from

E-2

disclosing such confidential and proprietary information as required by court order or process required by law, provided the Physician gives advance written notice of such disclosure.

1.7    Governing Law. The Agreement shall be governed by and construed in accordance with the laws of the State of Arkansas applicable to agreements made and to be performed wholly within that state, irrespective of such state's choice-of-law principles.

1.8    Partial Invalidity. If any provision of the Agreement is found to be invalid or unenforceable by any court or other lawful forum, such provision shall be ineffective only to the extent that it is in contravention of applicable laws without invalidating the remaining provisions of the Agreement, unless such invalidity or unenforceability would defeat an essential business purpose of the Agreement.

1.9    Waiver. No waiver of or failure by either party to enforce any of the provisions, terms, conditions, or obligations herein shall be construed as a waiver of any subsequent breach of such provision, term, condition, or obligation, or of any other provision, term, condition, or obligation hereunder, whether the same or different in nature. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

1.10    Amendments. The Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that, before any amendment shall become effective, it shall be reduced to writing and signed by each of the parties.

1.11    Survival. Except as otherwise expressly provided in the Agreement, all covenants, agreements, representations and warranties, expressed and implied, shall survive the termination of the Agreement, and shall remain in effect and binding upon the parties until they have fulfilled all of their obligations hereunder and the statute of limitations shall not commence to run

until the time such obligations have been fulfilled.

1.12    Compliance with All Laws, Regulations, and Standards. Physician represents and warrants that his/her performance under the Agreement shall fully comply with all applicable federal, state, and local statutes, rules, regulations, accreditation standards, applicable standards of other professional organizations, and Employer's Requirements as defined below, and that it shall be deemed a material breach of the Agreement by Physician if he/she shall fail to comply with this representation and warranty. If such a breach is not cured in accordance with the Agreement, Employer may immediately terminate the Agreement without penalty and without limiting any other rights and remedies set forth in the Agreement.

Specifically, but not by way of limitation, Physician represents and warrants that his/her performance under the Agreement shall comply with all applicable statutes, rules, regulations, accreditation standards, and other applicable standards of: Medicare; Medicaid; the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996 and regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information and Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Parts 160 and 164; the security and privacy provisions of the American Recovery and Reinvestment Act of 2009, and the regulations promulgated thereunder, as all of these may be amended from time to time; other federal or state health programs; The Joint Commission; the National Committee for Quality Assurance; and any national standards applicable in the hospital or medical fields, as well as the Medical Staff bylaws, policies, and procedures, and all other rules and regulations established by SVHS and/or the Medical Staff and applicable to performance under the Agreement (collectively, "Employer's Requirements"); and updates to incorporate any changes to such statutes, rules, regulations, accreditation standards, other

applicable standards, and Employer's Requirements.

1.13    Nondiscrimination. Physician shall not discriminate in the provision of professional services to patients based on race, color, national origin, ancestry, religion, sex, marital status, disability, sexual orientation, age, or any other legally prohibited basis, except as may be medically indicated.

1.14    PTRC. The parties acknowledge that the Agreement is subject to the review and approval of SVHS's Physician Transaction Review Committee ("PTRC"). In the event that the Agreement has been executed and final approval by the PTRC is not received in a timely manner, the Agreement shall automatically terminate. Such termination shall be considered without harm or damage to either party.

1.15    Termination Without Cause. Notwithstanding any other provision of this Agreement to the contrary, either party may terminate this Agreement upon one hundred eighty (180) days' prior written notice to the other party; provided, however, that the exercise of this clause by Employer shall require both the approval of the Employer's Board of Managers and the affirmative vote of at least 75% of the Employed Physicians then employed by the Employer (excluding the Physician).

1.16    Master Contract List. As required by the Stark law and related regulations, Employer and its Affiliates maintain master lists of contracts between Employer and its physician providers, including Physician. Upon reasonable and legal request, Employer shall provide a copy of such list to Physician, to the extent that it relates to any contracts with Physician, or to government entities permitted to have such lists pursuant to the Stark law and related regulations or other law or regulation.

1.17    Billing. Employer is authorized by the Agreement and this Exhibit to, and shall, submit bills for professional services rendered by Physician in the course of Physician's

employment with Employer and related activities. Employer also is authorized to submit updates, as needed, to Physician's National Provider Identifier (i.e., NPI). Employer shall be entitled to receive all remuneration for such professional services rendered by Physician, whether billed by Employer or not. Physician shall cooperate with and assist Employer (or Employer's designee) in the preparation of any and all financial, billing, and insurance records or reports and/or similar documents. Physician shall not receive or negotiate checks or payments attributable to the services rendered by Physician in the course of Physician's employment by Employer and related activities. Should Physician receive directly any checks or payments which should have been sent to Employer, Physician shall deliver and assign to Employer such checks or payments within not more than five (5) business days of receipt for deposit into an account in the name of Employer.

1.18    General Interpretation; Ambiguities. Ambiguities, if any, in the Agreement shall be reasonably construed in accordance with all relevant circumstances including, without limitation, prevailing practices in the industry of the parties in the place where the contract is to be performed and shall not be construed against either party, irrespective of which party may be deemed to have authored the ambiguous provision.

1.19    Prohibition on Child Labor and Human Trafficking. Each Party warrants and represents that it shall comply with all federal and state labor and employment laws, and executive orders as applicable and specifically those regarding child labor, procuring commercial sex, using forced labor and human trafficking. This includes but is not limited to the Trafficking Victims Protection Reauthorization Act of 2013, Executive Order – *Strengthening Protections Against Trafficking in Persons in Federal Contracts*, Federal Acquisition Regulations (FAR), the provisions of the International Labor Organization's ("ILO") Minimum Age Convention (No. 138), 1973, and any other laws or regulations that prohibit any form of human trafficking, commercial sex,

E-4

forced labor, child labor or other exploitation of children in the manufacturing, delivery or provision of products/devices, items or services and as each may be amended from time to time. In addition, in connection with any International Organization for Standardization ("ISO") certification, the Parties represent and warrant that as applicable each complies with the Social Accountability Guidelines pursuant to which a Party disqualifies any site that uses unacceptable manufacturing practices, such as child labor, forced labor or unsafe or unsanitary working conditions or trafficking of persons as defined by the Trafficking Protocol (United Nations General Assembly, *Protocol to Prevent Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime,* 15 November 2000, available at http://www.unhcr.org/refworld/docid/4720706c0.html). Physician acknowledges CHI's efforts on human trafficking found at http://www.catholichealthinit.org/human-trafficking-how-you-can-help and represents and warrants to CHI that he or she undertakes periodic inspections of his/her practices and staff regarding services hereunder to ensure compliance with the foregoing. Physician agrees upon request to provide CHI with evidence and/or recordkeeping of his/her compliance with this provision.

E-5

**EXHIBIT F**
*Signing Advance Note*

Twenty-Five Thousand Dollars ($25,000)                    _____ __, 2017

       FOR VALUE RECEIVED, the receipt of which is hereby acknowledged, Deepali Tukaye, M.D. ("Physician" and "Maker") hereby promises to pay to the order of Jack Stephens Heart Institute, LLC ("Holder"), at the place designated by Holder, the principal sum of  Twenty-Five Thousand Dollars ($25,000) or such lesser amount as is actually owing pursuant to the Physician Employment Agreement by and between Holder and Physician effective the __ day of _____, 2017, a copy of which is attached hereto as Exhibit A (the "Employment Agreement"), plus accrued interest at the annual rate of four and ~~one-quarter percent (4.25%) (i.e., one percent (1%) over the prime rate as of the Effective Date)~~ (the "Loan Rate"), payable in lawful money of the United States of America.  Installments of principal and interest shall commence as set forth in the Employment Agreement until all amounts due hereunder by Physician have been paid to Holder.  Notwithstanding the foregoing, the principal and interest due under this Note may be forgiven as set forth below.  Physician's obligations hereunder shall survive the expiration or termination of any other agreement between the parties, or between Employer and Physician, for any reason.

       Maker shall have the right to prepay all or any part of the principal outstanding on this Note at any ~~time without penalty.  All prepayments shall be credited, first, to interest accrued to the date of prepayment~~ and, next, to the principal outstanding on this Note.  Notwithstanding any partial prepayment pursuant hereto, Maker shall pay all scheduled payments until principal and interest on this Note are paid in full.

       Provided that the conditions set forth for such forgiveness therein are met, the monthly installments of principal and interest shall be forgiven as set forth in the Employment Agreement.  Amounts hereunder shall be immediately due and payable to the extent so provided in the Employment Agreement.

       This Note shall be secured by such security as is provided for pursuant to the Employment Agreement, if any.

       In no event shall any payment of interest or any other sum payable hereunder exceed the maximum amount permitted by applicable law.  If it is established that any payment exceeding lawful limits has been received, Holder will refund such excess or, at its option, credit the excess amount to the principal due hereunder, but such payments shall not affect the obligation to make periodic payments required herein.

       Maker agrees to pay, to the extent permitted by law, all costs and expenses incurred by Holder in connection with the collection and enforcement of this Note, including, but not limited to, expenses and reasonable attorneys' fees to the extent permitted by applicable law, irrespective of whether any suit or security foreclosure or court proceeding has been commenced.  Maker and all endorsers and all persons liable or to become liable on this Note, and each of them, hereby waive diligence, demands, presentation for payment, notice of nonpayment, protest, and notice of protest, and specifically consent to and waive notice of any renewals or extensions of this Note, or any modification or release of security for this Note (if any), whether made to or in favor of Maker or any other person or persons, and further agree that any such action by Holder shall not affect the liability of Maker or any person liable or to become liable on this Note.

If any payment due under this Note, or any part thereof, is not paid within ten (10) days from the date when due, or a default under the Employment Agreement occurs or a default occurs under the terms of this Note, then the entire principal sum and accrued interest, to the extent not otherwise forgiven hereunder, shall, at the option of Holder, at once become due and payable without notice, time being of the essence hereof, and shall bear interest from the date of such default until paid at the Loan Rate plus five percent (5%).

No delay or omission by Holder in exercising any remedy, right, or option under this Note shall operate as a waiver of such remedy, right, or option. In any event, a waiver on any one occasion shall not be construed as a waiver or bar to any such remedy, right, or option on a future occasion.

The invalidity of any one or more covenants, phrases, clauses, sentences, or paragraphs of this Note shall not affect the remaining portions hereof, and this Note shall be construed as if such invalid covenants, phrases, clauses, sentences, or paragraphs, if any, had not been included herein.

This Note is to be construed in all respects and enforced according to the laws of the State of Arkansas. A default under the terms of any instrument securing this Note shall constitute a default under this Note.

This Note may not be amended or modified except by a written agreement duly executed by Maker and Holder.

This Note and the obligations created hereby shall bind Maker and, to the extent applicable, Maker's successors and assigns, and the benefits hereof shall inure to Holder and its successors and assigns.

Any notice to Maker under this Note shall be in writing and shall be deemed to have been given upon (i) receipt, if hand delivered, (ii) transmission, if delivered by facsimile transmission, (iii) the next business day, if delivered by express overnight delivery service or (iv) the third business day following the day of deposit of such notice in U.S. certified mail, return receipt requested to the following address, or to such other address as Maker shall specify:

Deepali Tukaye, M.D.

_____

_____

Maker has executed and delivered this Note as of the date first set forth above.

Deepali Tukaye, M.D

F-2

**EXHIBIT G**
*Compliance with Immigration Act*

Employer agrees to sponsor Physician for a J-1 visa waiver with the State of Arkansas Department of Health, United States Department of State ("DOS"), and United States Citizenship and Immigration Services ("USCIS"). Employer agrees to sponsor Physician for J-1 visa waiver and H-1B nonimmigrant status with USCIS.

A. Beginning on or about July 1, 2017, Physician shall be employed by Employer full-time as a Interventional Cardiologist, providing clinical patient care for a minimum of forty (40) hours per week on average. On-Call and travel times are not included and are in addition to the minimum hours. Physician will be employed at Jack Stephens Heart Institute located at 525 Western Avenue, Suite 202, Conway, Arkansas 72034. Physician's practice location is in a federally designated Medically Underserved Area ("MUA") with a designation of 00160.

B. The Initial Term (as referred to in Section 7.1 of the Agreement) shall be for four years commencing on the Start Date. Physician agrees to commence employment within ninety (90) days of the United States Citizenship & Immigration Services (USCIS) approval of the J-1 waiver application and upon obtaining nonimmigrant H-1B status, which permits work authorization.

C. Employer and Physician agree to comply with the requirements of Section 214(l) of the Immigration and Nationality Act, as amended.

D. Notwithstanding the provisions contained in Exhibit C to the Agreement *(Compensation),* nothing in this Agreement shall be interpreted to allow the Physician's base salary to be less than the prevailing or actual wage as required by federal regulations relating to the Labor Condition Application filed in conjunction with the H-1B Petition for Nonimmigrant Worker so long as Physician maintains H-1B status.

E. Employer will sponsor Physician for a J-1 waiver with the State of Arkansas, DOS, and USCIS and H-1B visa status with the USCIS, assuming such waiver and H-1B status to be available. The parties specifically agree that a condition precedent to Physician's employment, under the terms of this Agreement, is Physician's receipt of the J-1 visa waiver and approval of H-1B status from USCIS. In the event that the J-1 waiver or H-1B status is not obtained by Physician, all terms and conditions of this Agreement shall terminate immediately with no continuing obligation or liability on the part of either party unless other legal work authorization is secured prior to the Effective Date of this Agreement.

F. Employer shall be responsible for payment of the required reasonable legal fees, government filing fees, and expenses associated with sponsorship of the J-1 waiver and H-1B visa status. Employer shall not seek reimbursement of such fees upon termination of Physician's employment unless allowed by law. Physician shall be responsible for payment of all legal fees and expenses for dependent family member visa applications. If Physician accepts employment with Employer, but fails to commence employment, Employer's obligation under this paragraph shall terminate and Physician will be responsible for reimbursing Employer for all employer legal fees and expenses paid.

G. Employer agrees to consider acting as a sponsor for Physician in applying for permanent residence in the United States after the first year of service unless extraordinary circumstances, as determined in the sole discretion of Employer, are present justifying an earlier consideration to the starting of the

G-1

permanent residence process. Employer shall pay up to Ten Thousand Dollars ($10,000) towards legal fees, government filing fees, and expenses for the permanent residency application, or fees specifically required to be paid by the Employer by law, whichever amount is greater. Employer shall not seek reimbursement of such fees upon termination of Physician's employment unless allowed by law.

H. Cost of Immigration Sponsorship.   Employer has a retained law firm that handles our immigration sponsorship matters. As Employer is responsible for paying the legal fees, costs and expenses associated with sponsorship for work status, Employer will utilize this law firm to handle any required work visa applications.  Physician agrees to cooperate with this firm to assist in the preparation and processing of any required immigration applications. Once the decision is made to proceed with permanent residence sponsorship as noted in Section 2, Employer will place Physician into contact with an attorney from this firm to discuss the process and what is needed.  The attorney, the Employer Leadership Team and Physician will collaborate to determine the most appropriate option for Employer to sponsor Physician for permanent residence. Employer will pay the attorney fees and costs associated with the permanent residence process for Physician directly to the retained law firm.  Physician, with the consent of Employer obtained in advance, may engage his or her own attorney for any portion of the permanent residence process that does not require Employer to pay the fees or costs.  In the event Physician selects his or her own attorney, Physician will be solely responsible for the legal fees, costs, and expenses associated with those portions of the permanent residence process. However, whether Employer's retained firm or Physician's own attorney is involved in the permanent residence process or any other visa process, Employer will not pay any fees, costs, or expenses for dependent family member's permanent residence applications, and these will be the sole responsibility of the Physician.